**Exhibit A to Joint Summary Judgment Stipulations**
**Page 1 of 66**



# cowbell®

# Cyber Risk Insurance Policy

PRIME 250SL 033 0720   © 2021






# TEXAS
# NOTICE TO POLICYHOLDERS
# COMPLAINTS

This Notice does not form a part of your insurance contract. No coverage is provided by this Notice, nor can it be construed to replace any provisions of your policy (including its endorsements). If there is any conflict between this Notice and your policy (including its endorsements), the provisions of your policy (including its endorsements) shall prevail.

## Have a complaint or need help?

If you have a problem with a claim or your premium, call your insurance company or HMO first. If you can't work out the issue, the Texas Department of Insurance may be able to help.

Even if you file a complaint with the Texas Department of Insurance, you should also file a complaint or appeal through your insurance company or HMO. If you don't, you may lose your right to appeal.

**Obsidian Specialty Insurance Company**
To get information or file a complaint with your insurance company:
   **Call: Complaints Dept at 800-684-5428**
   **Toll-free: 800-684-5428**
   Online: www.obsidianspecialty.com
   Email: complaints@obsidianspecialty.com
   Mail: 1330 Avenue of the Americas, Suite 23A, New York, NY 10019

**The Texas Department of Insurance**
To get help with an insurance question or file a complaint with the state:
   Call with a question: 1-800-252-3439
   File a complaint: www.tdi.texas.gov
   Email: ConsumerProtection@tdi.texas.gov
   Mail: MC 111-1A, P.O. Box 149091, Austin, TX 78714-9091

## ¿Tiene una queja o necesita ayuda?

Si tiene un problema con una reclamación o con su prima de seguro, llame primero a su compañía de seguros o HMO. Si no puede resolver el problema, es posible que el Departamento de Seguros de Texas (Texas Department of Insurance, por su nombre en inglés) pueda ayudar.

Aun si usted presenta una queja ante el Departamento de Seguros de Texas, también debe presentar una queja a través del proceso de quejas o de apelaciones de su compañía de seguros o HMO. Si no lo hace, podría perder su derecho para apelar.

**Obsidian Specialty Insurance Company**
Para obtener información o para presentar una queja ante su compañía de seguros o para:

**Llame a: Complaints Dept al 800-684-5428**
**Teléfono gratuito: 800-684-5428**
En linea: www.obsidianspecialty.com
Correo electrónico: complaints@obsidianspecialty.com
Dirección postal: 1330 Avenue of the Americas, Suite 23A, New York, NY
10019

**El Departamento de Seguros de Texas**
Para obtener ayuda con una pregunta relacionada con los seguros o para presentar una queja ante el estado:
Llame con sus preguntas al: 1-800-252-3439
Presente una queja en: www.tdi.texas.gov
Correo electrónico: ConsumerProtection@tdi.texas.gov
Dirección postal: MC 111-1A, P.O. Box 149091, Austin, TX 78714-9091

**Exhibit A to Joint Summary Judgment Stipulations**
**Page 4 of 66**



## COWBELL CYBER RISK INSURANCE DECLARATIONS – PRIME 250

**Policy Number:**   OBD-CB-S3DTFHJ5Z-002

**Renewal of:**     N/A

**Item 1.  Named Insured:**   Perry & Perry Builders, Inc.

Mailing Address:   215 E Cameron Ave
Rockdale, TX, 76567-2972

Email Address:   lin@ppbrockdale.com

**Item 2.  Policy Period:**  Inception Date: Aug 12, 2023 Expiration Date: Aug 12, 2024
(All dates at 12:01 a.m. Standard Time at the address as stated in Item 1).

**Item 3.  Aggregate Limit of Liability:** $ $1,000,000.00     each **Policy Period** for all payments
under all Coverages combined.

**Item 4.  Retroactive Date:**   See individual coverages below

**Exhibit A to Joint Summary Judgment Stipulations**
**Page 5 of 66**

**Item 5.  Limits:**

| Section I.A. | Coverage | Included (yes/no) | Each **Claim** Limit of Liability | Deductible / Waiting Period | Retroactive Date |
|---|---|---|---|---|---|
| (1) | Cowbell Breach Fund | yes | $1,000,000.00 | $5,000.00 | N/A |
| (2) | Data Restoration | yes | $1,000,000.00 | $5,000.00 | N/A |
| (3) | Extortion Costs | yes | $1,000,000.00 | $5,000.00 | N/A |
| (4) | Business Impersonation Costs | yes | $1,000,000.00 | $5,000.00 | N/A |
| (5) | Reputational Harm Expense | yes | $1,000,000.00 | 24  hours | 08/12/2021 |

| Section I.B. | Coverage | Included (yes/no) | Each **Claim** Limit of Liability | Waiting Period | Retroactive Date |
|---|---|---|---|---|---|
| (1) | Business Interruption Loss | yes | $1,000,000.00 | The greater of: $5,000.00 or 24 hours | N/A |
| (2) | Contingent Business Interruption Loss | yes | $1,000,000.00 | The greater of: $5,000.00 or 24 hours | N/A |
| (3) | System Failure Business Interruption Loss | yes | $1,000,000.00 | The greater of: $5,000.00 or 24 hours | N/A |
| (4) | System Failure Contingent Business Interruption Loss | yes | $1,000,000.00 | The greater of: $5,000.00 or 24 hours | N/A |
| (5) | Cyber Crime Loss | yes | $250,000.00 | $10,000.00 | N/A |
| (6) | Bricking Costs | yes | $1,000,000.00 | $5,000.00 | N/A |
| (7) | Criminal Reward Costs | yes | $100,000.00 | N/A | N/A |

| Section I.C | Coverage | Included (yes/no) | Each *Claim* Limit of Liability | Deductible | Retroactive Date |
|---|---|---|---|---|---|
| (1) | Liability Costs | yes | $1,000,000.00 | $5,000.00 | Full Prior Acts |
| (2) | PCI Costs | yes | $1,000,000.00 | $5,000.00 | Full Prior Acts |
| (3) | Regulatory Costs | yes | $1,000,000.00 | $5,000.00 | Full Prior Acts |

**Item 6. Territorial Scope:** Worldwide

**Item 7. Extended Reporting Period:**
12 Months at an additional 75% of premium
24 Months at an additional 125% of premium
36 Months at an additional 150% of premium

**Item 8. Premium:** $ 7,758.00 (includes TRIA)

☐ does not include commission; % of premium will not be paid to broker
☑ does include commission; % of premium will be paid to broker

**TRIA:**                        $  76.82
**Underwriting Fee:**            $  350.00
**Surplus Lines Tax:**          $  0.00
**Surplus Stamping Fee:**       $  0.00
**Total:**                       $  8,108.00

Obsidian Specialty Insurance Company NAIC # 16871

**Item 9.** **Endorsements attached**:

| TITLE | FORM# |
|---|---|
| Texas Policy Holder Notice | OPN069 1220 |
| Cowbell Cyber Risk Insurance Declarations - Prime 250 | PRIME 250SL 002 07 20 |
| Notice to Policyholders - OFAC | PN006SL 09 20 |
| Customer Notice of Privacy Policy & Producer Compensation Practices Disclosure | PN007SL OB 09 20 |
| Cowbell Cyber Risk Insurance Policy - Prime 250 | PRIME 250SL 001 10 20 |
| Service of Process | PRIME 250SL 075 12 20 |
| California Consumer Privacy Act | PRIME 250SL 004 09 20 |
| General Data Protection Regulation | PRIME 250SL 005 09 20 |
| Utility Fraud Attack | PRIME 250SL 006 09 20 |
| Media Liability | PRIME 250SL 007 09 20 |
| Cowbell Breach Fund Separate Limit | PRIME 250SL 014 04 23 |
| Contingent Bodily Injury and Property Damage Endorsement | PRIME 250SL 010 09 20 |
| Missed Bid | PRIME 250SL 012 09 20 |
| Amendatory Construction | PRIME 250SL 015 09 20 |
| Amend Cooperation Clause | PRIME 250SL 019 09 20 |
| Blanket Additional Insured | PRIME 250SL 021 09 20 |
| BIPA Exclusion Endorsement | PRIME 250SL 048 09 21 |
| Cyber Terrorism Amendatory Endorsement | PRIME 250SL 050 08 22 |
| Disclosure Pursuant to Terrorism Risk Insurance Act | PRIME 250SL 028 10 20 |
| Cap on Losses From Certified Acts of Terrorism | PRIME 250SL 029 10 20 |
| Trade or Economic Sanctions Exclusion Endorsement | PRIME 250SL 032 09 20 |
| CB-Compliance | CB-COMPLIANCE (12/20) |
| Texas Surplus Lines Notice | CB-TX-NOTICE (12/20) |

**Exhibit A to Joint Summary Judgment Stipulations**
**Page 8 of 66**

**Item 10. Notice:**

All notice to **Insurer** pursuant to Policy Section IV.C., including notice of a potential or actual **Claim** or **Cyber Event**, shall be:

Emailed to:
claims@cowbellcyber.ai

Or
Reported at:
1-833-633-8666

Or
Logged in using below URL:
https://console.cowbellcyber.ai

These Declarations along with the completed and signed Application and Policy form with any written endorsements attached hereto shall constitute the entire contract between the **Insureds** and **Insurer**.

## THIS IS A CLAIMS MADE POLICY.  PLEASE READ IT CAREFULLY.

# SIGNATURE PAGE

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Obsidian Specialty Insurance Company NAIC # 16871

_(signature)_

(Emily Canelo)
Chief Legal Counsel

_(signature)_

(William Jewett)
CEO

# NOTICE TO POLICYHOLDERS
## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL (OFAC)

No coverage is provided by this Notice, nor can it be construed to replace any provisions of your policy (including its endorsements). If there is any conflict between this Notice and your policy (including its endorsements), the provisions of your policy (including its endorsements) shall prevail.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC and possibly by the U.S. Department of State. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces economic and trade sanctions policy based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's website – http://www.treas.gov/ofac.

In accordance with OFAC regulations, or any applicable regulation promulgated by the U.S. Department of State, if it is determined that you and any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

# CUSTOMER NOTICE OF PRIVACY POLICY AND PRODUCER COMPENSATION PRACTICES DISCLOSURE

## Privacy Policy Disclosure

Your privacy is important to us. We will keep the information you provide to us secure and handle it only as permitted by law. This notice tells you about our Privacy Policy and how we handle your information.

"Personal information" is information that identifies you as an individual and is not otherwise available to the public. It includes personal financial information and personal health information. We collect personal information to service your application, account and claims and to support our business functions.

We will continue to follow our Privacy Policy regarding personal information even when a business relationship no longer exists between us.

### Collection of Information

We collect personal information so that we may offer quality products and services. We may obtain personal information from the following sources:

- Directly from you, such as your name, address and social security number.
- Directly from us, such as your premium payment history.
- From third parties, such as companies that have your driving record or claims history.
- From medical professionals or medical records.
- From inspections or photos taken of your property.
- From consumer report agencies. Upon request, we will tell you how to get a copy of this report. The agency that prepares the report for us may retain the report and disclose it to others as permitted by law.

We, and the third parties we partner with, may track some of the web pages you visit through cookies, pixel tagging or other technologies. We currently do not process or comply with any web browser's "do not track" signals or similar mechanisms that request us to take steps to disable online tracking. You may be able to set your browser to reject cookies. Please review your browser or device's "Help" file to learn the best way to modify your settings. Please note that rejecting cookies may disrupt certain functionality of the Website.

### Disclosure of Information

We may disclose non-public, personal information you provide, as required to conduct our business and as permitted or required by law. We may share information with third parties such as:

- Third parties who perform professional, insurance or business functions for us.
- Insurance institutions, agents or consumer reporting agencies in connection with any application, policy or claim involving you or your policy.
- Claims adjusters, appraisers and others to defend or settle claims involving your policy.
- An insurance regulatory authority in connection with the regulation of our business, or to a law enforcement agency, governmental authority or other authorized person or institution to protect our legal interests, detect or prevent insurance fraud or criminal activity, or as otherwise permitted or required by law.
- Businesses that conduct scientific or actuarial research.
- Lienholders, mortgagees, lessors or other persons having a legal or beneficial interest in your property.

PN007SL OB 0920                                                                 Page 1 of 3

We will not sell or share your personal financial information with anyone for purposes unrelated to our business functions without offering you the opportunity to "opt-out" or "opt-in" as required by law.

We only disclose personal health information with your authorization or as otherwise allowed or required by law.

**Safeguards to Protect your Personal Information**

We recognize the need to prevent unauthorized access to the information we collect, including information held in an electronic format on our computer systems. We maintain physical, electronic and procedural safeguards intended to protect the confidentiality and integrity of all non-public, personal information.

**Internal Access to Information**

We restrict access to your non-public personal information to those employees who need to know it in order to provide products and services to you, and we train our employees on how to handle and protect that information. Our employees have access to personal information in the course of doing their jobs, such as:

- underwriting policies;
- paying claims;
- developing new products; or
- advising customers of our products and services.

**Consumer Reports**

In some cases, we may obtain a consumer report in connection with an application for insurance. Depending on the type of policy, a consumer report may include information about you or your business, such as:

- character, general reputation, personal characteristics, mode of living;
- audit history, driving record (including records of any operators who will be insured under the policy); and/or
- an appraisal of your dwelling or place of business that may include photos and comments on its general condition.

Upon written request, we will inform you if we have ordered an investigative consumer report. You have the right to make a written request within a reasonable period for information concerning the nature and scope of the report and to be interviewed as part of its preparation. You may obtain a copy of the report from the reporting agency and, under certain circumstances, you may be entitled to a copy at no cost.

**Access to Information**

You have the right to request access to the personal information that we record about you, to have reasonable access to it and to receive a copy. To do so, contact us at:

Obsidian Insurance Holdings, Inc.
Privacy Office
1330 Avenue of the Americas, Suite 23A
New York, NY 10019

Please include your complete name, address, and policy number(s), and indicate specifically what you would like to see. If you request actual copies of your file, there may be a nominal charge. We will tell you to whom we have disclosed the information within the two years prior to your request. If there is not a

record indicating that the information was provided to another party we will tell you to whom such information is normally disclosed.

There is information that that we cannot share with you. This may include information collected in order to evaluate a claim under an insurance policy or when the possibility of a lawsuit exists. It may also include medical information that we would have to forward to a licensed medical doctor of your choosing so that it may be property explained.

**Correction of Information**

If after reviewing your file you believe information is incorrect, please write to the consumer reporting agency or to us, whichever is applicable, explaining your position. The information in question will be investigated. If appropriate, corrections will be made to your file and the parties to whom the incorrect information was disclosed, if any, will be notified. However, if the investigation substantiates the information in the file, you will be notified of the reasons why the file will not be changed. If you are not satisfied with the evaluation, you have the right to place a statement in the file explaining why you believe the information is incorrect. We also will send a copy of your statement to the parties, if any, to whom we previously disclosed the information and include it in any future disclosures.

**Changes to this Policy**

We will periodically review and revise our Privacy Policy and procedures to ensure that we remain compliant with all state and federal requirements. If any provision of our Privacy Policy is found to be noncompliant, then that provision will be modified to reflect the appropriate state or federal requirement. If any modifications are made, all remaining provisions of this Privacy Policy will remain in effect.

**Contact**

For more detailed information about our Privacy Policy, visit our website: www.obsidianspecialty.com.

## Producer Compensation Disclosure

Our products are sold through independent agents and brokers, often referred to as "Producers". We may pay Producers a fixed commission for placing and renewing business with our company. We may also pay an additional commission and other forms of compensation and incentives to Producers who place and maintain their business with us.



# COWBELL CYBER RISK INSURANCE POLICY – PRIME 250

**WITH RESPECT TO INSURING AGREEMENT C. THIS POLICY PROVIDES COVERAGE ON A CLAIMS MADE AND REPORTED BASIS AND APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR THE OPTIONAL EXTENSION PERIOD (IF APPLICABLE) AND REPORTED TO THE INSURER IN ACCORDANCE WITH THE TERMS OF THIS POLICY. AMOUNTS INCURRED AS FIRST PARTY EXPENSE AND FIRST PARTY LOSS UNDER THIS POLICY WILL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO DEDUCTIBLES.**

**PLEASE READ THE ENTIRE POLICY CAREFULLY**.

In consideration of the payment of premium and in reliance upon all statements made and information furnished to the **Insurer**, including the statements made in the **Application**, and subject to all terms, conditions and limitations in this **Policy**, the **Insured** and **Insurer** agree as follows:

| SECTION I. INSURING AGREEMENTS |
| --- |

Only the Insuring Agreements with Limits shown in the Cowbell Cyber Risk Insurance Declarations apply.

### A. FIRST PARTY EXPENSE COVERAGE

The **Insurer** will pay on behalf of the **Insured**, all **First Party Expense** directly resulting from a **Cyber Event** which is first discovered by the **Insured** during the **Policy Period** or Extended Reporting Period (if applicable).

**First Party Expense** means the following necessary and reasonable costs incurred by the **Insured** (whether voluntary or otherwise) with the **Insurer's** consent and which consent will not be unreasonably withheld:

    (1) Cowbell Breach Fund which includes:
        (a) **Forensics**;
        (b) **Notification**;
        (c) **Identity Monitoring Services**;
        (d) **Incident Response**;
        (e) **Crisis Management**;
        (f) **Incident Consultation**;
        (g) **Overtime Salaries**; and
        (h) **Healthcare Records Remediation Service**.
    (2) **Data Restoration**;
    (3) **Extortion Costs**;
    (4) **Business Impersonation Costs**; and
    (5) **Reputational Harm Expense**.

### B. FIRST PARTY LOSS COVERAGE

The **Insurer** will reimburse the **Insured**, all **First Party Loss** directly resulting from a **Cyber Event** which is first discovered by the **Insured** during the **Policy Period** or Extended Reporting Period (if applicable).

**First Party Loss** means the following:
    (1) **Business Interruption Loss**;
    (2) **Contingent Business Interruption Loss**;
    (3) **System Failure Business Interruption**;
    (4) **System Failure Contingent Business Interruption**;

**(5) Cyber Crime Loss**;
**(6) Bricking Costs**; and
**(7) Criminal Reward Costs**.

**First Party Loss** does not include **Liability Expense**.

## C.  LIABILITY EXPENSE COVERAGE

The **Insurer** will pay on behalf of the **Insured**, all **Liability Expense** for a **Claim** first made and reported to the **Insurer** during the **Policy Period** or Extended Reporting Period (if applicable) directly resulting from a **Cyber Event** which is first discovered by the **Insured** during the **Policy Period**.

**Liability Expense** means:
(1)  Liability Costs
  (a) **Defense Expenses**;
  (b) Monetary damages the **Insured** becomes legally obligated to pay including pre-judgment interest, post judgment interests, judgments or settlements;
  (c) Punitive, exemplary, or multiplied damages but only to the extent such damages are insurable under the applicable law most favorable to the insurability of such damages;
(2) **PCI Costs**; and
(3) **Regulatory Costs**.

**Liability Expense** does not include: (1) **First Party Expense**; (2) **First Party Loss**; (3) taxes, the return or repayment of fees, deposits, commissions, royalties, future profits or charges for goods or services; (4) the costs incurred in the recall, re-performance or correction of services, content, goods or activities; costs to comply with injunctive or other non-monetary relief, including specific performance or any agreement to provide such relief; (5) liquidated damages pursuant to a contract, to the extent such amount exceeds the amount for which the **Insured Organization** would have been liable in the absence of such contract; or (6) matters which are uninsurable pursuant to the applicable law to which this **Policy** is construed.

---

### SECTION II. DEFINITIONS

A. **Application** means the application accepted for the issuance of this **Policy** by the **Insurer**, including any and all materials and information submitted to the **Insurer** in connection with such application.

B. **Bricking Costs** means the reasonable and necessary costs, subject to the **Insurer's** prior consent, to replace, remediate or improve the **Insured's Computer System**. Such costs must be incurred as a direct result of a **Network Security Incident** and must be in excess of expense the **Insured** would have incurred had there been no **Network Security Incident**.

C. **Business Impersonation** means the fraudulent communications (including but not limited to communications transmitted by website, email or phone call) from a third party designed to impersonate the **Insured Organization** or an individual **Insured**, with the goal of deceiving any individual, or any vendor or supplier of the **Insured Organization,** into sharing credentials or **Protected Information** with such third party.

D. **Business Impersonation Costs** means the costs to inform potentially impacted individuals, vendors or suppliers of a **Business Impersonation**.

E. **Business Interruption Loss** means **Income Loss** and **Extra Expense** incurred by the **Insured Organization** during the **Period of Recovery** which exceeds the **Waiting Period**, due to an **Interruption of Service** as a result of a **Network Security Incident**.

F. **Claim** means any: (1) written demand for **Money** or non-monetary relief, written demand for arbitration or written request to toll or waive a statute of limitations received by the **Insured**; (2) civil proceeding in a court of law or equity, including any appeal therefrom, which is commenced by the filing of a complaint, motion for judgment or similar pleading, against the **Insured**; (3) administrative or regulatory investigation, inquiry, suit, proceeding, prosecution or governmental actions against the **Insured** solely with respect to a **Privacy Incident**; (4) an arbitration or other alternative dispute resolution proceeding against the **Insured** for monetary damages or non-monetary or injunctive relief, commenced by the **Insured's** receipt of a request or demand for such proceeding, including any appeal thereof; or (5) written notice received by the **Insured** for **PCI Costs** from a third party, with whom the **Insured Organization** has entered into a **Payment Card Services Agreement**, as a result of actual or alleged non-compliance with the **PCI DSS.**

G. **Client** means any person or entity with whom **Insured** has entered into a written contract to provide services or deliverables.

H. **Computer System** means:
   (1) Computer hardware;
   (2) **Software**;
   (3) Firmware and associated input and output devices;
   (4) Mobile and wireless devices;
   (5) Data storage devices;
   (6) Networking equipment;
   (7) Storage area network;
   (8) Backup facilities; and

   **Computer System** also means any of the foregoing that are:
   (a) part of an Industrial Control System (ICS), which are controls, systems and instrumentation used to operate or automate industrial processes; or
   (b) operated by and either owned by or leased to the **Insured Organization**; or
   (c) systems operated by a third-party service provider and used for the purpose of providing hosted computer application services, including cloud services, to the **Insured Organization** or for processing, maintaining, hosting or storing the **Insured Organization's Electronic Data**, pursuant to written contract with the **Insured Organization** for such services.

I. **Contingent Business Interruption Loss** means **Income Loss** and **Extra Expense** incurred by the **Insured Organization** resulting from an **Interruption of Service** of a **Service Provider's Computer System**, but only if such **Interruption of Service** would have been covered under this **Policy** if such **Service Provider** had been **Insured**, applying the same terms and conditions herein.

J. **Criminal Reward Costs** means any amount offered by the **Insured** for information that leads to the arrest and conviction of any individual(s) committing or trying to commit any illegal act related to any coverage under this **Policy**. **Criminal Reward Costs** does not include, and this **Policy** will not cover, any amount offered and paid for information provided by the **Insured**, the **Insured's** auditors, whether internal or external, any individual hired or retained to investigate the aforementioned illegal acts, or any other individuals with responsibilities for the supervision or management of the aforementioned individuals.

K. **Crisis Management** means public relations or crisis communication services for the purpose of protecting or restoring the reputation of, or mitigating financial harm to, an **Insured**.

L. **Cyber Crime Incident** means:
   **(1) Telecommunications Hack;**
   **(2) Social Engineering Attack;**
   **(3) Reverse Social Engineering Attack; or**
   **(4) Transfer of Funds Loss**

**M. Cyber Crime Loss** means:
   **(1)** charges incurred by the **Insured** from its telecommunications provider, directly resulting from a **Telecommunications Hack**; and
   **(2)** loss of **Money** or **Digital Currency** directly resulting from any of the following:
   **(a) Social Engineering Attack**;
   **(b) Reverse Social Engineering Attack**; or
   **(c) Transfer of Funds Loss.**

   **Cyber Crime Loss** does not include any amounts reimbursed or reversed by a financial institution.

**N. Cyber Event** means:
   **(a) Privacy Incident**;
   **(b) Network Security Incident**; or
   **(c) Cyber Crime Incident.**

   With respect to I.C.I. Liability Costs, **Cyber Event** also means **Media Incident**.

**O. Cyberterrorism** means the use of information technology to execute attacks or threats by any person or group, whether acting alone, or on behalf of, or in connection with, any individual, organization, or government, with the intention to:

   **(1)** cause harm;
   **(2)** intimidate any person or entity; or
   **(3)** cause destruction or harm to critical infrastructure or data, in furtherance of financial, social, ideological, religious, or political objectives;

   which results in a threat or harm to **Your Network Security**.

**P. Data Restoration** means replacement, restoration, recreation or recovery of data residing on an **Insured's Computer System** which is compromised as a direct result of a **Network Security Incident**. If such data is unable to be replaced, restored, recreated or recovered, then **Data Restoration** is limited to the costs to make this determination.

**Q. Defense Expenses** means reasonable and necessary costs, charges, fees (including but not limited to attorneys' fees, legal fees, and experts' fees) and expenses (except for wages, salaries, fees, bonuses or stock options, or any other form of compensation of the **Insured** or the directors, officers or employees of the **Insured**) incurred by or on behalf of the **Insured** in defending or investigating **Claims** under this **Policy**, as well as the premium for any appeal, attachment or similar bonds, provided that the Insurer shall have no obligation to apply for or furnish such bonds. **Defense Expenses** do not include **First Party Loss** or **First Party Expense**.

**R. Denial of Service Attack** means a malicious attack that is designed to slow or completely interrupt access to a **Computer System** or website.

**S. Digital Currency** means a type of digital currency that:
   **(1)** requires cryptographic techniques to regulate the generation of units of currency and verify the transfer thereof;
   **(2)** is both stored and transferred electronically; and
   **(3)** operates independently of a central bank or other central authority.

**T. Electronic Data** means information that exists in electronic form, including electronic **Personally Identifiable Information** and electronic **Protected Information**. **Electronic Data** does not include **Software** or **Digital Currency**.

U. **Extortion Costs** means:

>> **(1)** expenses to investigate the cause of an **Extortion Threat** and to discover if any **Privacy Incident** has occurred; and

>> **(2)** payment amounts, including the actual costs to execute such payment amount (whether in **Digital Currency** or traditional currency) in response to an **Extortion Threat**.

V. **Extortion Threat** means a credible threat or series of threats to cause a **Privacy Incident** or **Network Security Incident**.

W. **Extra Expense** means the actual costs incurred by the **Insured** in excess of its normal operating expenses to reduce or avoid **Income Loss** provided they are in excess of expenses the Insured would have incurred had there been no **System Failure** or **Network Security Incident**.

**Extra Expense** does not include: (1) **Data Restoration**; (2) the costs to replace, remediate or improve the **Computer System** other than the coverage provided in **First Party Loss** and **First Party Expense**; (3) **Bricking Costs**; (4) costs to identify or remove software program errors, or to establish, implement or improve network or data security practices, policies or procedures; (5) costs or expenses that exceed the amount of **Income Loss** that is thereby reduced or avoided; and (6) consequential or liquidated damages, fines, interest, or penalties of any nature, however denominated, arising by contract.

**Extra Expense** does not mean and will not include costs for better computer systems or services than the Insured had before a **System Failure** or **Network Security Incident**, including upgrades, enhancements and improvements.

However, this will not apply if the cost for a more current or secure version of a **Computer System** is:

1. no more than 25% greater than the cost that would have been incurred to repair or replace the **Computer System** the **Insured** had before a **Network Security Incident;** or

2. substantially equivalent to (or less than) the cost to repair or replace the **Computer System** the **Insured** had before a **System Failure** took place.

Under no circumstances will the **Insurer** pay costs of acquiring or installing **Computer Systems** which did not form a part of the **Insured's Computer Systems** immediately prior to the **Network Security Incident**.

X. **First Party Expense.** See **Policy** Section I, A.

Y. **First Party Loss.** See **Policy** Section I, B.

Z. **Forensics** means the reasonable investigation and analysis charged by third-party service providers of the **Computer System** to determine the cause, extent, and scope of a **Privacy Incident** or **Network Security Incident**. **Forensics** does not include **Incident Response**.

AA. **GDPR** means the General Data Protection Regulation (Regulation (EU) 2016/679) and any amendment thereto. The **GDPR** shall also include any state, provincial, territorial, local, or federal regulations enacted in furtherance of or pursuant to implementation of the General Data Protection Regulation (Regulation (EU) 2016/679) and any amendment thereto.

BB. **GDPR Proceeding** means a formal investigation of or an administrative adjudication proceeding against an **Insured** concerning the **GDPR** by an administrative or regulatory agency, including an appeal thereof, commenced by the **Insured's** receipt of a subpoena, investigative demand, complaint, or similar document.

CC. **Healthcare Records Remediation Service** means the following services:

>> **(1)** Conducting credit and non-credit investigations to identify fraudulent use of protected health information;

**(2)** Establishing a hotline for the **Insured**'s potentially affected individuals in compliance with the Health Information Technology for Economic and Clinical Health Act (HITECH) (U.S.) requirements or the requirements of any similar Canadian federal, provincial or territorial law, act, statute or regulation; and

**(3)** Conducting healthcare identity restoration services for **Insured**'s potentially affected individuals.

**DD. Identity Monitoring Services** means credit monitoring, identity monitoring or identity restoration services and identification theft insurance (provided we shall have no obligation to furnish such insurance), for a period of up to two years (or more if required by law) for individuals whose **Protected Information** was or may have been impacted as a direct result of a **Privacy Incident.**

**EE. Incident Consultation** means necessary and reasonable costs charged by a law firm, forensics and/or public relations firm designated by the **Insurer** to provide immediate consultative services following the **Insured's** discovery of an actual or suspected **Privacy Incident** or **Network Security Incident. Incident Consultation** does not include **Incident Response**.

**FF. Incident Response** means the costs and expenses charged by the law firm, forensics and/or public relations firm, designated by the **Insurer** to coordinate the investigation and response efforts following a **Privacy Incident** or **Network Security Incident,** and including those costs and expenses required to comply with **Privacy and Security Regulations** concerning such **Privacy Incident** or **Network Security Incident**.

**GG. Income Loss** means the **Insured Organization's** measurable net profit before income taxes that the **Insured Organization** would have earned had no intervening event taken place, or the net loss before income taxes the **Insured Organization** is unable to avoid, during the **Period of Recovery**.

**HH. Insured** means the **Insured Organization** as well as any past, present or future: director, officer, board member, trustee, owner, partner, principal, manager, and employee (including full time, part time, temporary, leased, seasonal, independent contractor and volunteer) but only for acts performed within the scope of their duties on behalf of the **Insured Organization**.

**II.    Insured Organization** means **Named Insured** and any **Subsidiary**.

**JJ.    Insurer** means the entity issuing this **Policy** listed on the Declarations.

**KK. Interrelated Incident** means any **Privacy Incidents**, **Network Security Incidents, Cyber Crime Incidents** or **Media Incidents** that have as a common nexus any: (1) fact, circumstance, situation, event, transaction or cause; or (2) series of causally connected facts, circumstances, situations, events, transactions or causes.

**LL. Interruption of Service** means the actual and measurable interruption or degradation in performance of the **Insured's** **Computer System**. **Interruption of Services** also means a voluntary shutdown of the **Insured's** **Computer System** when such action is taken to minimize, avoid or reduce **Unauthorized Access** or **Unauthorized Use**.

**MM. Liability Expense.** See **Policy** Section I, C.

**NN. Money** means currency, coins or bank notes in current use and having face value; and traveler's checks, registered checks, or money orders held for sale to the public.

**OO. Media Incident** means any actual or alleged:

**(1)** Defamation, slander, libel, or product disparagement alleged by a person or organization

that claims to have been defamed, slandered or libeled, or by a person or organization that claims that his, her or its products have been disparaged;

**(2)** Appropriation of name or likeness or publicity that places a person in a false light; or public disclosure of private facts;

**(3)** Infringement of title, slogan, trademark, trade name, trade dress, service mark or service name;

**(4)** Copyright infringement, plagiarism, or misappropriation of information or ideas; or

**(5)** Improper deep linking or framing;

directly resulting from publication of content on the **Insured Organization's** website, in its printed material, or posted by or on behalf of the **Insured** on any social media site.

**Media Incident** shall not include false advertising or labeling on the **Insured's** products or services.

**PP.** **Named Insured** means the legal entity stated in Item 1. of the Declarations.

**QQ. Negative Publicity Event** means a communication via any medium, including but not limited to television, print, radio, electronic, or digital form regarding previously non-public information specifically arising from an actual or alleged **Privacy Incident**, **Network Security Incident**, **Media Incident**, or **Cyber Crime Incident** that threatens to, or actually does, negatively and material harm the **Insured**'s reputation.

**RR. Negative Publicity Event Waiting Period** means the corresponding amount of hours, as shown in Section 1.A. Item 5. of the Declarations applicable to the **Reputational Harm Expense**, beginning with the time that a **Negative Publicity Event** is first discovered.

**SS. Network Security Incident** means the **Insured's** actual or alleged failure to prevent: (1) **Unauthorized Access** to or **Unauthorized Use** of the **Computer System** or **Third-Party Network**; (2) a **Denial of Service Attack** upon or directed at the **Computer System** or **Third-Party Network**; or (3) malicious code or computer virus created or transmitted by or introduced into the **Computer System** or **Third-Party Network** that does or could destroy, alter, manipulate, or degrade the integrity or performance of a **Computer System**.

**TT.** **Notification** means sending notice and providing call center services for individuals whose **Protected Information** was or may have been impacted as a direct result of a **Privacy Incident**.

**UU.** **Overtime Salaries** means the reasonable overtime salaries paid to employees of the **Insured** assigned to handle inquiries from the parties affected by a **Cyber Event**.

**VV. Payment Card Services Agreement** means a written agreement between the **Insured Organization** and a financial institution, a payment card company or payment card processor which enables the **Insured Organization** to accept credit, debit, prepaid or other payment cards as payment for goods or services provided by the **Insured Organization**.

**WW. PCI Costs** means amounts the **Insured Organization** is legally obligated to pay under a **Payment Card Services Agreement** including: (1) monetary assessments; (2) fines; (3) penalties; (4) chargebacks; (5) reimbursements; (6) fraud recoveries; (7) forensic investigation, including any PCI forensic investigator; and (8) costs or expenses incurred in connection with a **PCI DSS** compliance audit. **PCI Costs** will not include any amount levied against the **Insured** for non-compliance with **PCI DSS** that continues after the **Insured** has notice of such non-compliance or costs or expenses incurred to update or improve privacy or network security controls, policies, or procedures to a level beyond that which existed prior to the event giving rise to PCI Costs or to be compliant with applicable Payment Card Industry Data Security Standards.

XX.  **PCI DSS** means the Payment Card Industry Data Security Standards now in effect or as amended.

YY.  **Period of Indemnity** means the period of time beginning at the conclusion of the **Negative Publicity Event Waiting Period** and ending at the earlier**:**
   **(1)**  the date that the **Insured** discontinues to suffer a loss of net income; or
   **(2)**  six months after the conclusion of the **Negative Publicity Event Waiting  Period** and not limited by the expiration of the **Policy Period**

ZZ.  **Period of Recovery** is the continuous period of time that begins at the time of **Interruption of Service** of the **Computer System** and ends when the **Computer System** is reasonably restored or repaired, or in the exercise of due diligence and dispatch could have been restored, to the same functionality and level of service that existed prior to the interruption degradation, or suspension. In no event will the **Period of Recovery** exceed one hundred eighty (180) days.

AAA.  **Personally Identifiable Information** means:
   **(1)**  any information from which an individual may be uniquely and reliably identified or contacted, including but not limited to an individual's name, telephone number, email address, social insurance number, social security number, medical or healthcare data or other protected health information, biometric record, driver license number, state, provincial, or territorial identification number, account number, credit card number, debit card number, or access code or password that would permit access to that individual's financial account;
   **(2)**  any other non-public personal information as defined in **Privacy and Security Regulations.**

BBB.  **Privacy Incident** means:
   **(1)**  any actual or alleged failure by:
      **(a)**  the **Insured**;
      **(b)**  a third party for whom the **Insured** is legally responsible; or
      **(c)**  a Service Provider under written contract with the **Insured** to process, store or maintain **Protected Information** on behalf of the **Insured**

   to prevent **Unauthorized Access**, **Unauthorized Use**, acquisition, manipulation, loss, theft or misappropriation of **Protected Information. Privacy Incident** also means the violation of the **Insured Organization's** privacy policy unintentionally committed by the **Insured**;
   **(2)**  a violation of any **Privacy and Security Regulations**; and
   **(3)**  the unauthorized or wrongful collection, retention or use of **Personally Identifiable Information** by the **Insured**.

CCC.  **Privacy and Security Regulations** means any local, state, federal, and foreign identity theft and privacy protection laws, legislation, statutes, or regulations that requests (1) notice to persons whose **Personally Identifiable Information** was, or reasonably considered likely to have been, accessed or acquired by an unauthorized person; or (2) notice to regulatory agencies of such incident.

   **Privacy and Security Regulation** does not include the **GDPR**.

DDD.  **Professional Services** means those acts or services requiring specialized knowledge, skill, or professional judgment that the **Insured** renders to others pursuant to a written agreement and for a fee or other consideration.

EEE.  **Property Damage** means physical damage to, loss or destruction of tangible property, including the loss of use of such property.

FFF.  **Protected Information** means the following in any format: (1) any non-public **Personally Identifiable Information** (including but not limited to personal health information), whether in

electronic form, paper or otherwise as defined in any **Privacy and Security Regulations**; and (2) any confidential or proprietary information of a third party provided to the **Insured** and protected under a previously executed confidentiality agreement for which the **Insured** is legally responsible to maintain in confidence.

GGG. **Policy** means this policy (including the Declarations, **Application** and any information provided therewith) and any written endorsements attached hereto.

HHH. **Policy Period** means the period of time from the inception date of this **Policy** shown in the Declarations specified in Item 2. of the Declarations to the expiration date shown in the Declarations, or its earlier cancellation or termination date.

III.    **Regulatory Costs** means:
(1) amounts paid to a consumer redress fund;
(2) fines; or
(3) penalties
imposed by a federal, state or foreign governmental entity in such entity's regulatory or official capacity, due to a **Privacy Incident**.

JJJ. **Reputational Harm Expense**
(1) means **Income Loss** the **Insured** sustains during the **Period of Indemnity** that directly results from a **Negative Publicity Event**. For purposes of this coverage, **Income Loss** means the net profit before income taxes that the **Insured** is prevented from earning or the additional net loss before income taxes that the **Insured** incurs, due to:
(a) Termination of the **Insured's** service contracts with one or more of the **Insured's Clients**;
(b) Reduction in the value of the **Insured**'s business and brands; or
(c) Both **(1)** and **(2)** of this definition
arising directly from a **Privacy Incident**, **Network Security Incident**, or **Cyber Crime Incident**.

(2) does not include any:
(a) contractual penalty;
(b) expense incurred to identify or remediate **Software** program errors or vulnerabilities;
(c) **Liability Expense**;
(d) cost resulting from an actual interruption or suspension of an **Insured's** business directly cause by a **Privacy Incident**, **Network Security Incident, System Failure** or **Media Incident;**
(e) legal cost or expense;
(f) loss arising out of liability to any third party;
(g) fee or expense for the services of a public relations firm, crisis management firm or law firm to advise an **Insured** on minimizing the harm to an **Insured's** brand or reputation, or restoring public confidence in an **Insured**;
(h) other consequential loss or damage; or
(i) **Claim**, **Privacy Incident**, **Network Security Incident** or **Media Incident** covered under I.A.1. to I.A.4 of the Declarations.

KKK. **Reverse Social Engineering Attack**, also known as invoice manipulation, means the intentional use of the **Computer System** to mislead or deceive the **Insured**'s **Client** or **Vendor**, through misrepresentation of a material fact which is relied upon, believing it to be genuine, and which results in the **Insured's Client** or **Vendor** transferring **Money** or **Securities**, or **Digital Currency** intended for the **Insured** to another person or entity.

LLL. **Securities** means negotiable and nonnegotiable instruments or contracts representing either **Money** or Property.

**MMM.** **Service Provider** means a business the **Insured** does not own, operate, or control, but that the **Insured** hire for a fee pursuant to a written contract to perform services related to the conduct of **the Insured's** business, including but not limited to:
  **(1)** Maintaining, managing, or controlling **Computer Systems**;
  **(2)** Hosting or facilitating the **Insured's** internet website; or
  **(3)** Providing administrative functions, human relations, marketing or other outsourced services to the **Insured**.

**Service Provider's Computer System** means the **Computer System** owned or operated by the Service Provider performing these functions designated in **(1)** through **(3)** above.

**NNN.** **Social Engineering Attack** means the manipulation or deception, by an unauthorized third party, of a director, officer, board member, trustee, owner, partner, principal, manager, or employee (including full time, part time, temporary, leased, seasonal, independent contractor and volunteer) of the **Insured Organization**, who is authorized to request or make payments on behalf of the **Insured Organization**. The manipulation or deception must be accomplished by the transmission of fraudulent communications by the unauthorized third party, and cause the director, officer, board member, trustee, owner, partner, principal, manager, or employee (including full time, part time, temporary, leased, seasonal, independent contractor and volunteer) to transfer, pay or deliver the **Insured Organization's Money** to an unintended third-party recipient.

**OOO.** **Software** means operations and applications, codes and programs by which **Electronic Data** are electronically collected, transmitted, processed, stored, or received. **Software** does not include **Electronic Data**.

**PPP.** **Subsidiary** means any entity while the **Named Insured**: (1) owns more than 50% of such entity's outstanding voting securities, partnership or membership units; (2) has the right to elect or appoint a majority of such entity's directors, officers, managers or trustees; or (3) has sole control over such entity's management structure pursuant to a written contract. **Subsidiary** also means any entity that is acquired by the **Insured Organization** during the **Policy Period** and whose record count or annual revenues do not exceed 15% of the **Insured Organization**.

**QQQ.** **System Failure** means:
  **(1)** an accidental, unintentional, or negligent act or an error or omission committed by the **Insured** or the **Service Provider** in the course of:
    **(a)** data processing, programming, maintenance, service, conversion, modifying, handling, developing, or maintaining **Electronic Data** or **Software**; or
    **(b)** operating, maintaining, or repair of **Computer Systems**, including the collection, compilation, processing, warehousing, mining, storage, or management of data; and
  **(2)** the physical theft of hardware, or components thereof, controlled by the **Insured** on which **Electronic Data** is stored, by a person other than an **Insured**, from premises occupied and controlled by the **Insured**.

**RRR.** **System Failure Business Interruption** means the **Insurer** shall pay the **Insured** for **Business Interruption Loss** the **Insured** sustains and reimburse the **Insured** for any related **Extra Expense** the **Insured** incurs during the **Period of Recovery** which exceeds the **Waiting Period** due to a **System Failure** that directly results in an **Interruption of Service** that first occurs during the **Policy Period**.

**SSS.** **System Failure Contingent Business Interruption** means we shall pay the **Insured** for **Business Interruption Loss** the **Insured** sustains and reimburse the **Insured** for any related **Extra Expense** the **Insured** incurs during the **Period of Recovery** which exceeds the **Waiting Period** due to a **System Failure** of a **Service Provider's Computer System** that directly results in an **Interruption of Service** that first occurs during the **Policy Period** but only if such **Interruption of Service** would have been covered under this **Policy** if such **Service Provider** had been the **Insured**, applying the same

terms and conditions herein.

TTT. **Telecommunications Hack** means the unauthorized infiltration and manipulation by a third party of the **Insured's** telephone or fax system in connection with its normal business activities.

UUU. **Third-Party Network** means computer hardware, **Software** and networking equipment owned, leased or operated by an entity or individual, other than an **Insured**, and who is operating under written contract with the **Insured Organization** to provide business process outsourcing services or information technology services in support of the **Insured Organization's** business operations.

VVV. **Transfer of Funds Loss** means loss of funds directly resulting from the transmission of fraudulent instructions to a financial institution which direct that financial institution, to initiate an electronic funds transfer from the **Insured's** account, or otherwise debit the **Insured's** account.

WWW.**Unauthorized Access** means the gaining of access to a **Computer System** by an unauthorized person or persons, or by an authorized person or persons in an unauthorized manner.

XXX. **Unauthorized Use** means the use of a **Computer System** by an unauthorized person or persons or by an authorized person or persons in an unauthorized manner.

YYY. **Vendor** means any person or entity with whom the **Insured Organization** has entered into a written contract to provide services to the **Insured Organization** and is not owned, operated, or controlled by the **Insured Organization**.

ZZZ. **Voice computer system** means a **Computer System** which provides a capability used for the direction or routing of telephone calls in a voice communication network.

AAAA. **Waiting Period** means the number of consecutive hours specified in Item 5. of the Declarations that immediately follows the **Interruption of Services** related to the **Insured's Computer System** or a **Third-Party Network** and will apply to each **Period of Recovery**.

BBBB. **Your Network Security** means the use of hardware, **Software**, firmware and written security policies and procedures by the **Insured**, or by others on the **Insured**'s behalf, to protect against **Unauthorized Access** to, or the **Unauthorized Use** of, your **Computer System** including the use of the **Insured**'s **Computer System** in a **Denial of Service Attack**.

---

| SECTION III. EXCLUSIONS |
|---|

The **Insurer** will not make any payment for any **First Party Loss, First Party Expense,** or **Liability Expense** based upon, arising out of, directly or indirectly resulting from, or in the consequence of:

A.  Conduct                Any actual or alleged dishonest, fraudulent, criminal, or malicious, act, error or omission or willful violation of any statute or regulation by or with the knowledge of (1) the Owner, (2) President, (3) Chief Executive Officer, (4) Chief Operating Officer, (5) Chief Financial Officer, (6) Chief Information Officer, (7) Chief Technology Officer, (8) Chief Security Officer,(9) Chief Privacy Officer, (10) General Counsel, (11) Partner, (12) Director of Risk Management or any individual in a position functionally equivalent to any of the aforementioned 12 positions of the **Insured Organization**; provided, however, that this exclusion will not apply to **Defense Expenses** until there

is an admission, plea of no contest, a final non-appealable adjudication, binding arbitration or judgment in a proceeding establishing such conduct.

**B.** War — War or Civil Unrest based upon, arising out of, or attributable to: (1) war, including undeclared or civil war, or action by a military force, including action in hindering or defending against an actual or expected attack, by any government or sovereign, or other authority using military personnel or other agents; or (2) insurrection, rebellion, revolution, riot, usurped power, or action taken by governmental authority using military personnel in hindering or defending against any of these, however, this exclusion does not apply to **Cyberterrorism**.

**C.** Unlawful Profit — Any actual or alleged remuneration, profit or other advantage to which the **Insured** is not legally entitled.

**D.** Property Damage and Bodily Injury — Any actual or alleged (1) **Property Damage** or; (2) **Bodily Injury**, physical injury, sickness, pain, suffering, disease or death of any person. **Bodily Injury** means mental anguish, emotional distress, pain and suffering, whether or not resulting from injury to the body, sickness, disease or death of any natural person, however, this exclusion does not apply to mental anguish, emotional distress, pain and suffering, or shock resulting from a **Privacy Incident**.

**E.** Theft — Any actual or alleged loss, transfer or theft of monies, **Securities** or the value of tangible properties; provided however, this exclusion will not apply to an otherwise covered **Cyber Crime Loss** or **Transfer of Funds Loss**.

**F.** Force Majeure — Any actual or alleged fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, act of God, epidemic, nature, or any other physical event.

**G.** Pollution — Any actual or alleged discharge, dispersal, release or escape of toxic chemicals, liquids or gases, waste materials, pollutants or any other contaminants.

**H.** Outage — Any actual or alleged electrical or mechanical failure including telecommunications, Internet service telecommunications, Internet service, satellite, cable, electricity, gas, water or other utility service providers not under the **Insured Organization's** operational control, whether or not there is another cause of loss which may have contributed concurrently or in any sequence to a loss. For the avoidance of doubt, this exclusion will not apply to any failure or outage in, or disruption of, power, utility services, satellites, or telecommunications external services under the direct operational control of the **Insured**.

**I.** ERISA/SEC — Any actual or alleged violations of the Employee Retirement Income Security Act of 1974, the Securities Act of 1933, the Securities Exchange Act of 1934, any amendments thereto or any rules or regulations promulgated in connection therewith, or any derivative suit.

**J.** Intellectual Property — Any actual or alleged violation or infringement of any intellectual property right or obligation, including:

    1.  infringement of copyright of software, firmware, or hardware;

    2.   misappropriation, misuse, infringement, or violation of any patent or trade secret;

    3.   distribution or sale of, or offer to distribute to sell, any goods, products, or services; or

    4.   other use of any goods, products, or services that infringes or violates any intellectual property law or right relating to the appearance, design, or function of any goods, products, or services;

however, this exclusion will not apply to an otherwise covered **Media Incident** provided that, this exception to exclusion J. Intellectual Property will not apply to any violation or infringement of any intellectual property right or obligation described in items 1. and 2. above.

**K.** Reduced Value of Data

Any actual or alleged reduction in economic or market value of any data.

**L.** Consumer Protection

Any actual or alleged unsolicited communications including fax, email, and text), false advertising, deceptive trade practices, restraint of trade, unfair competition or antitrust violations, including any as a violation of the Truth in Lending Act, Fair Debt Collection Practices Act, Telephone Consumer Protection Act, Fair Credit Reporting Act, Federal Trade Commission Act, Sherman Anti-Trust Act, the Clayton Act, or any amendments to the foregoing, or related state laws or anti-spam statutes or those concerning a person's right to seclusion, provided, however, this exclusion does not apply if such unsolicited electronic dissemination of faxes, electronic mail or other communications to multiple actual or prospective customers by the **Insured** or any other third party was caused by a **Network Security Incident.**

**M.** Employment Discrimination

Any actual or alleged employment practice violation or a **Claim** by or on behalf of any **Insured**; provided, however, that this exclusion will not apply to an otherwise covered **Claim** arising out of a **Privacy Incident**.

**N.** Prior Knowledge

Any: (1) **Claim, Privacy Incident, Network Security Incident, Cyber Crime Incident, Media Incident, Interrelated Incident**, fact, circumstance, transaction or event which has been the subject of any written notice given under any other policy before the inception date of this **Policy**; (2) prior or pending litigation, regulatory or administrative proceeding or any **Claim** of which the **Insured** had knowledge or received notice prior to the inception date of this **Policy** or, if this **Policy** is a renewal of another policy issued by the **Insurer**, the first such insurance policy issued to the **Named Insured** by the **Insurer** and continuously renewed until the inception date of this **Policy**; or (3) any matter that prior to the inception date of this **Policy**, or if this **Policy** is a renewal of another policy issued by the **Insurer**, the first such insurance policy issued to the **Named Insured** by the **Insurer** and continuously renewed until the inception date of this **Policy**, the **Insured** knew or reasonably should have known could lead to a **Claim, First Party Loss, First Party Expense** or **Liability Expense**.

**O.** Governmental Acts

Any: (1) action by a public or governmental entity, including the seizure or destruction of the **Insured's Computer System** or (2) a government required closure.

**P.** Games of Chance

Any contest, game of chance or skill, gambling, lottery, or promotional game, including tickets or coupons or over-redemption related thereto.

**Q.** Breach of Contract

Any contractual liability or obligation or any breach of any contract, warranty, guarantee or prime, including any liability of others assumed by any **Insured**; provided, however, this exclusion shall not apply:
1) if such liability would have attached to the **Insured** even in the absence of such contract, warranty, guarantee or promise;
2) to any obligation to maintain the confidentiality or security of **Personally Identifiable Information** or **Protected Information**, solely if such liability arises out of a **Privacy Incident** or **Network Security Incident**; or
3) to any obligation to comply with the Payment Card Industry Data Security Standard under a merchant services agreement or similar contract.

**R.** Breach of Warranty

Any actual or alleged:
1) breach of any warranty, guarantee, or prime of fitness or suitability, whether express, implied, constructive, oral or written;
2) inaccurate, inadequate, or incomplete description of the price of your goods, products or services; or
3) failure of any good, product or service to conform with an advertised quality or performance,

provided, however, that this exclusion does not apply to any:
a) **Liability Expenses** resulting from any **Claim** made against any **Insured**;
b) **First Party Expense** you incur resulting from a **Cyber Event**
c) other amount claimed under any other Coverage that would exist even in the absence of such warranty, guarantee, or promise.

**S.** Insured vs. Insured

Any Claim made by or on behalf of, or at the behest of, or for the benefit of, any Insured against any other Insured. This exclusion shall not apply to any **Claim** brought by:
1) any **Insured** in his or her capacity:
   a) as your customer or **Client**; or
   b) as your employee or independent contractor for a **Privacy Incident** relating to the theft, loss, unauthorized access, or unauthorized disclosure of such employee's or independent contractor's **Personally Identifiable Information**; or
2) any entity other than you if any **Insured** served as a director or officer of such entity at the time the **Cyber Event** took place.

**T.** Product or Service Failure

Any:
(1) failure of the **Insured's** products, including **Software**, to perform the function, or serve the purpose, intended by any third party or any **Insured**; or
(2) the rendering of or failure to render **Professional Services**,

however, this exclusion shall not apply to any obligation to maintain the confidentiality or security of **Personally Identifiable Information** or **Protected Information,** solely if such liability arises out of a **Cyber Event**.

---

| SECTION IV. GENERAL TERMS AND CONDITIONS |
|---|

**A.** Limit of Insurance and Deductible

(1) The aggregate limit of liability as indicated in Item 3. of the Declarations is the maximum the **Insurer** is obligated to pay for all **First Party Loss** and **First Party Expense**, covered by this **Policy**. The aggregate limit of liability as indicated in Item 3. of the Declarations is the maximum the **Insurer** is obligated to pay for all **Liability Expense** covered by this **Policy**.

(2) The **Insurer** will only be liable for those amounts payable under this **Policy** which are in excess of the applicable Deductible(s). Such Deductibles must be paid by the **Insured** and cannot be insured.

(3) In the event more than one Deductible/**Waiting Period** applies to any **Claim**, **First Party Loss, First Party Expense,** or **Liability Expense** the maximum total Deductible/Waiting Period applicable to such **Claim, First Party Loss, First Party Expense,** or **Liability Expense** shall be the largest of such applicable Deductible/**Waiting Period.**

(4) With respect to the Declarations Section II.B.1. to II.B.4., the applicable Retention/**Waiting Period** is the greater of:
    (a) the applicable dollar Retention amount; or
    **(b) the Waiting Period**
set forth in Item 5. of the Declarations for the respective Insuring Agreement. **Business Interruption Loss, Contingent Business Interruption Loss,** and **Extra Expense** applicable to the Retention/**Waiting Period** shall be computed as the start of the **Interruption of Service.**

(5) With respect to the Insuring Agreement I.A.5., the **Insurer** shall pay only **Reputational Harm Expense** in excess of the **Negative Publicity Event Waiting Period** listed under Item 5.I.A.(5).


**B.** Defense and Settlement

The **Insurer** has the right and duty to defend, and the right to select counsel to defend an **Insured** against any **Claim**, even if the allegations of the **Claim** are groundless, false or fraudulent. The **Insurer's** duty to defend will cease upon of the exhaustion of the **Liability Expense** aggregate limit of liability as indicated in Item 5.I.C.(1). of the Declarations. The **Insured** agrees not to make any payment, participate in any settlement, admit liability, assume obligation or incur any **First Party Loss, First Party Expense,** or **Liability Expense** without the prior written consent of the **Insurer**, which consent will not be unreasonably withheld. The **Insured** must provide the **Insurer** with full assistance and cooperation and must provide all information deemed necessary to investigate any **Privacy Incident**, **Network Security Incident** or **Media Incident**, settle any **Claim**, or pay any **First Party Loss, First Party Expense,** or **Liability Expense.**

If the **Insured** refuses to consent to any settlement or compromise recommended by the **Insurer** and acceptable to the claimant, the **Insurer's** liability for such **Claim** will not exceed:

    1. the amount for which such **Claim** could have been settled plus **Defense Expenses** incurred up to the time and date the **Insured** refused to settle such **Claim**; and

    2. fifty percent (50%) of **Liability Expenses** incurred after such settlement was refused by the **Insured,**

in excess of the amount such **Claim** could have settled under such settlement. The remaining **Liability Expenses** shall be borne by, or on behalf of, the **Insured** at its own risk.


**C.** Notice

1. Notice to **Insurer**

As a condition precedent to coverage under this **Policy**

    (a) the **Insured** must provide written notice to the **Insurer** of any **Privacy Incident**,
        **Network Security Incident** or **Cyber Crime Incident** as soon as possible after
        the **Insured** is made aware of such **Privacy Incident**, **Network Security
        Incident** or **Cyber Crime Incident** but in no event more than ninety (90) days
        after the **Privacy Incident**, **Network Security Incident** or **Cyber Crime Incident**
        is discovered by the **Insured**. The **Insured** will not incur any **First Party Loss**
        and **First Party Expense** without the **Insurer's** consent; and

    (b) the **Insured** must provide written notice to the **Insurer** of any **Claim** as soon as
        possible after the **Insured** is made aware of such **Claim** but no later than ninety
        (90) days after the end of the **Policy Period** or end of the Extended Reporting
        Period (if applicable). The **Insured** will not incur any **Liability Expense** without
        the **Insurer's** consent.

2. Notice of Circumstance

If, during the **Policy Period** or Extended Reporting Period (if applicable) any **Insured** first
becomes aware of a **Privacy Incident**, **Network Security Incident** or **Media Incident** which may
reasonably give rise to a future **Claim** under this **Policy** and gives written notice to the **Insurer**
of:

    a) the nature of the **Privacy Incident**, **Network Security Incident** or **Media Incident**;
    b) the parties involved;
    c) the injury or damages that has or may result therefrom; and
    d) the circumstances by which the **Insured** first became aware thereof;

then any **Claim** arising out of an **Interrelated incident** that involves a **Privacy Incident**, **Network
Security Incident** or **Media Incident** that is subsequently made against the **Insured** will be
related back to and be deemed to have been made at the time any **Insured** gave such written
notice of circumstances to the **Insurer**.

The **Insured** will provide written notice to the **Insurer** either to the mailing or email address set
forth in Item 10. of the Declarations. Communication or assistance in connection with any **Incident
Consultation** DOES NOT constitute Notice to **Insurer** or Notice of Circumstance under this
**Policy**.

D. Proof of Loss

Requests for payment or reimbursement of **First Party Loss** and **First Party Expense,** incurred
by the **Insured** will be accompanied by a proof of such **First Party Loss** and **First Party
Expense**. Such proof of loss must include, in detail, how the costs were calculated, what
assumptions have been made and will include any applicable reports, books of accounts, bills,
invoices and other vouchers or proofs of payment made by the **Insured** in relation to such **First
Party Loss** and **First Party Expense**. Furthermore, the **Insured** will cooperate with, and provide
any additional information reasonably requested by, the **Insurer** in its investigation of **First Party
Loss** and **First Party Expense**, including but not limited to the exercise of the **Insurer's** right to
investigate and audit the proof of loss and inspect the records of an **Insured**.

**Business Interruption Loss** or **Contingent Business Interruption Loss** will be determined by
taking full account and due consideration of an **Insured's** proof of loss in addition to business
conditions affecting the **Insured Organization's** net profit, including net profit gained during the
same period in the prior year, had the **Network Security Incident** not occurred. Under no
circumstances will the determination include a potential increase in net profit the **Insured** may

have earned as a result of an increase in the volume of the **Insured Organization's** business due to potential favorable business conditions.

The **Insured** may examine any **Insured** under oath, while not in the presence of any other **Insured** and at such times as may be reasonably required, about any matter relating to this insurance or the **Claim**, including an **Insured's** books and records. In the event of an examination, an **Insured's** answers must be signed.

E.   Extended Reporting Period

1.   Automatic Extended Reporting Period

If this **Policy** is cancelled or non-renewed for any reason other than non-payment of premium, the **Named Insured** will have an automatic Extended Reporting Period, for a period of sixty (60) days after the end of the **Policy Period**.

2.   Additional Extended Reporting Period

If this **Policy** is cancelled or non-renewed for any reason other than non-payment of premium, provided the **Insured** does not obtain replacement coverage as of the effective date of such cancellation or non-renewal, the **Named Insured** will have the right to purchase an Additional Extended Reporting Period within sixty (60) days after the end of the **Policy Period**. Such Additional Extended Reporting period will be for a period of:

    a.   12 months after the end of the Automatic Extended Reporting Period and will be subject to an additional premium of 75% of the annualized premium;

    b.   24 months after the end of the Automatic Extended Reporting Period and will be subject to an additional premium of 125% of the annualized premium; or

    c.   36 months after the end of the Automatic Extended Reporting Period and will be subject to an additional premium of 150% of the annualized premium.

The Additional Extended Reporting Period is non-cancelable and the additional premium for the Additional Extended Reporting Period will be fully earned at the time of purchase.

The Additional Extended Reporting Period does not increase or reinstate any limits of insurance and does not provide coverage for **First Party Loss, First Party Expense,** or **Liability Expense** from any **Privacy Incident**, **Network Security Incident**, **Cyber Crime Incident** or **Media Incident** which first takes place after the end of the **Policy Period**. A change in terms, conditions, exclusions or premiums of this **Policy** will not be considered a non-renewal for purposes of triggering the **Named Insured's** right to purchase an Additional Extended Reporting Period.

F.   Cancellation and Non-Renewal

1.   Cancellation

a.   The **Named Insured** may cancel this **Policy** by surrender of this **Policy** to the **Insurer** or by giving prior written notice to the **Insurer** stating such cancellation shall take effect.

b.   This **Policy** may not be canceled by the **Insurer** except for one or more of the following reasons:

    i.   non payment of premium; or

    ii.   fraud or material misrepresentation affecting this **Policy**.

c.   Written Notice of cancellation shall be mailed or delivered by the **Insurer** to the **Named Insured** at least:

    i.   15 days prior to the effective date of cancellation, if this Policy is cancelled for

nonpayment of premium; or
ii. 60 days prior to the effective date of cancellation, if this Policy is cancelled for any reason other than nonpayment of premium.
d. In the event of cancellation, the **Insurer** shall refund the unearned premium pro rata.

2. Nonrenewal

If the **Insurer** elects not to renewal this Policy, the **Insurer** shall mail to the **Named Insured** written notice thereof at least 60 days prior to the expiration of the **Policy Period** unless:
   a. the reason for the nonrenewal is due to the nonpayment of premium; or
   b. the **Named Insured** has abstained replacement coverage with another insurance company.

The **Insurer's** offer of renewal terms and conditions or premium different than those in effect prior to the renewal shall not constitute an election by the **Insurer** not to renew this Policy.

3. Notice

The **Insurer** shall send all notices required under this Subsection IV.F.1. by certified mail or registered mail to the **Named Insured** at the address in Item 1. of the Declarations, and by mail or electronic mail to the **Named Insured's** authorized agent or broker, if any. Proof of mailing shall be sufficient proof of notice.

**G.** Spouses, Domestic Partners, Estates and Legal Representatives

Coverage under this **Policy** will extend to any **Claim** resulting from any **Privacy Incident**, **Network Security Incident** or **Media Incident** made against the lawful spouse or domestic partner of an **Insured** as well as the estate, heir or legal representative of an **Insured** who is deceased or legally incompetent, insolvent or bankrupt; however, no coverage is provided for any act, error or omission of said spouse, domestic partner, estate, heir or legal representative. It is further understood that all terms and conditions of this **Policy** apply to such **Claim** made against an **Insured's** spouse, domestic partner, estate, heir or legal representative.

**H.** Application, Representations and Severability

The **Insured** represents that the particulars and statements contained in the **Application** are true, complete and accurate. The **Insured** issued this **Policy** in reliance upon the truth of those representations and such particulars and statements by the **Insured**, which are deemed to be incorporated into and constitute part of this **Policy**, are the basis of this **Policy**. In the event there is any material misrepresentation, untruth or other omission in connection with any of the statements of facts in the **Application** then this **Policy** will be void with respect to: (1) any **Insured** who knew of such misrepresentation, untruth or omission; and (2) the **Insured Organization** but only if the Owner, President, Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, Chief Information Officer, Chief Technology Officer, Chief Security Officer, Chief Privacy Officer, General Counsel, Partner, Director of Risk Management, or any individual in a position functionally equivalent to any of those aforementioned positions of the **Insured Organization** knew of such misrepresentation, untruth or omission.

**I.** Subrogation

In the event of any payment under this **Policy**, and there is the ability to recover against any third party, it is agreed that the **Insured** tenders its rights of recovery to the **Insurer**. The **Insured** also agrees to assist the **Insurer** in exercising such rights. If prior to the **Privacy Incident**, **Network Incident**, **Cyber Crime Incident** or **Media Incident** connected with such payment, the **Insured** has agreed in writing to waive such rights of recovery against a third party, then the **Insurer** will not, and will not have an obligation to, pursue its rights of recovery against said third party.

J.   Other Insurance

**First Party Loss** and **First Party Expense** covered by this **Policy** is also covered by any other valid and collectible **policy** with an applicable sublimit that is lower than the available limit under this **Policy**, then this **Policy** will apply as the primary policy.

If any **Claim** covered by this **Policy** is also covered by any other valid and collectible policy, then this **Policy** will only apply to the **Liability Expense** in excess of the amount of any deductible, retention or limit of insurance under such other policy whether such other policy is stated to be primary, contributory, excess, contingent or otherwise, unless such other policy is written specifically excess of this **Policy**.

K.   Territory

The coverage provided under this **Policy** applies worldwide. However, coverage provided under this **Policy** does not apply to the extent that trade or economic sanctions or other similar laws or regulations prohibit the **Insurer** from providing coverage or payment of **Claims**.

L.   Currency

All **First Party Loss, First Party Expense, Liability Expense**, premium, limits of liability, retention and any other amounts under this Policy are expressed and payable in the currency of the United States of America. If any settlement, judgement, **First Party Loss, First Party Expense**, **Liability Expense** or any other amounts under this **Policy** are incurred, stated, determined or adjudicated in a currency other than United States dollars then payment shall be made in United States dollars at the rate of exchange published in the Wall Street Journal on the date the **Insurer** is obligated to pay such amount.

M.   Material Changes

1.   Acquisition or Formation of Subsidiary

a.   If during the **Policy Period**, the **Named Insured** acquires or forms any **Subsidiary**, then the coverage of this **Policy** shall automatically apply to such acquired or formed organization from the data of such acquisition or formation, unless the annual revenue of such acquired or formed organization immediately preceding such acquisition or formation is more than 20% of the consolidated annual revenue of the **Named Insured's** revenues immediately preceding such acquisition or formation.

b.   if, during the **Policy Period**, the **Named Insured** acquires or forms any **Subsidiary** and the annual revenue of such acquired or formed organization immediately preceding such acquisition or formation is more than 20% of the consolidated annual revenue of the **Named Insured's** revenues immediately preceding such acquisition or formation, coverage for such acquired or formed organization shall apply from the date of such acquisition or formation and be conditioned upon:

i.    the **Named Insured** notifying the **Insurer** in writing within 90 days of the acquisition or formation of such organization;

ii.   our receiving full information including an application as the **Insurer** deems necessary;

iii.  the **Named Insured's** agreement to any modification, premium adjustment, or both modification and premium adjustment, to this **Policy** that we may require with respect to such organization;

iv.   the **Insurer's** agreement in writing to provide such coverage; and

v.    the **Named Insured's** payment of any additional premium when due.

c.  Coverage under this **Policy** for any **Subsidiary** formed or acquired during the **Policy Period** shall apply only with respect to a **Privacy Incident**, **Network Security Incident, Cyber Crime Incident** or **Media Incident** that first took place prior to the effective date of such merger, acquisition or appointment.

2. Cessation of Subsidiaries

If any organization ceases to be a **Subsidiary**, no coverage shall be provided under this **Policy** with respect to any such organization for any:

a.  **Privacy Incident, Network Security Incident, Cyber Crime Incident** or **Media Incident** involving such organization

b.  amount claims under any Coverage incurred or sustained by any such organization or persons,

after the date such organization ceased to be a **Subsidiary**.

3. Acquisition or Bankruptcy of the **Named Insured**

If during the **Policy Period** any of the following occurs:

a)  the acquisition by any person or entity or affiliated group of persons or entities of 50% or more of the **Named Insured's** issued and outstanding voting securities representing the present right to vote for the election of the **Named Insured's** directors;

b)  the acquisition, divestiture, or sale of more than 50% of your assets or liabilities (as reflected in the **Named Insured's** most recent financial statement) by or to any person or entity or affiliated group of persons or entities;

c)  the appointment of a receiver, conservator, trustee, liquidator, rehabilitator, or any similar official for or with respect to the **Named Insured**; or

d)  the **Named Insured's** merger with or consolidation into any other entity such that the **Named Insured** is not the surviving entity,

then such coverage as existed under this **Policy** before such event shall continue in full force and effect for any **Privacy Incident**, **Network Security Incident, Cyber Crime Incident** or **Media Incident** occurring before any of the events shown in IV.M.3.a., IV.M.3.b., IV.M.3.c., IV.M.3.d.. However, solely with respect to the events as shown in IV.M.3.a., IV.M.3.b., IV.M.3.c., IV.M.3.d., coverage shall cease with respect to any **Privacy Incident**, **Network Security Incident, Cyber Crime Incident** or **Media Incident** occurring after such event.

The occurrence of an event as shown in IV.M.3.a., IV.M.3.b., IV.M.3.c., IV.M.3.d. shall not affect the **Insured's** right to purchase an Extended Reporting Period unless all premium due for the remainder of the **Policy Period** has not been fully paid within 30 days of the effective date of such event, in which case the **Insured** shall have no right to purchase the Extended Reporting Period.

N.  Assignment

Assignment of interest under this **Policy** will not bind the **Insurer** unless its consent is endorsed hereon.

O.  Conformity to Law

Any terms of this **Policy** in conflict with the terms of any applicable laws are hereby amended to conform to such laws.

P.  Legal Action Against the **Insurer** and Bankruptcy

No action may be taken against the **Insurer** unless, as a condition precedent thereto, there has

been full compliance with all the terms of this **Policy** and the amount of an **Insured's** obligation to pay has been finally determined either by judgment against an **Insured** after adjudicatory proceedings, or by written agreement of the **Named Insured**, the claimant and the **Insurer**. No legal action can be brought under this **Policy** against anyone other than by the **Named Insured**.

Bankruptcy or insolvency of any **Insured** or the estate of any **Insured** will not relieve the **Insurer** of its obligations under this **Policy**.

**Q.**  Alternative Dispute Resolution (ADR)

The **Insurer** and the **Named Insured** shall submit any dispute or controversy arising out of or relating to this **Policy** to non-binding mediation. Unless otherwise agreed by the parties, such non-binding mediation shall be administered by the American Arbitration Association in accordance with its then-prevailing Commercial Mediation Rules.

If the dispute is not resolved in the mediation, then either party to the mediation may thereafter commence a judicial proceeding against the other party with respect to such dispute, provided that neither party may commence such a judicial proceeding prior to 90 days following termination of the mediation.

The parties to the mediation shall share equally the fees and expenses of the mediator as well as other common expenses of the mediation process.

**R.**  Representative of the **Insured**

By acceptance of this **Policy**, the **Named Insured** will be designated to act on behalf of all **Insureds** for all purposes including the giving and receiving of all notices and correspondence, the cancellation or non-renewal of this **Policy**, the payment of premiums and the receipt of any return premiums that may be due under this **Policy**.

**S.**  Entire Agreement

This **Policy** constitutes the entire agreement between the parties. The terms, conditions and limitations of this **Policy** can be waived or changed only by written endorsement. No change to this **Policy** can be made except by written endorsement to this **Policy** signed by an authorized representative of the **Insured**. Headings used in this **Policy** are for convenience and do not expand or interpret the **Policy** terms.

cowbell®

## SERVICE OF PROCESS ENDORSEMENT

Solely for the purpose of coverage under this endorsement it is understood and agreed the following changes are made to the **Policy**:

I. In any cause of action arising under this **Policy**, or certificate, cover note, or other confirmation of this insurance issued by the **Insured's** surplus lines agent, **Insurer** will, at the **Insured's** request, submit to the jurisdiction of a court of competent jurisdiction within the United States as required by applicable law. Nothing herein constitutes or should be understood to constitute a waiver of **Insurer's** rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. In any suit instituted against **Insurer** upon this **Policy**, **Insurer** will abide by the final decision of such court or of any appellate court in the event of appeal.

II. All lawful process may be served in any action, suit or proceeding instituted by, or on behalf of, the **Insured** or any beneficiary under this policy, against **Insurer** arising out of this **Policy**, upon:

Obsidian Insurance Holdings, Inc.
General Counsel
1330 Avenue of the Americas, Suite 23A
New York, NY 10019

III. Pursuant to any law of any state, the District of Columbia or territory of the United States which makes provision therefore, **Insurer** hereby designates the Superintendent, Commissioner or Director of Insurance or other applicable individual specified for that purpose in the applicable statute or regulation, or his successor or successors in office, as attorney or agent for receipt of lawful service of process as **Insurer's** true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured** or any beneficiary hereunder arising out of this **Policy**, and **Insurer** hereby designates the above-named as the person to whom the said individual, the surplus lines producer, or any applicable state surplus lines association or stamping office, is authorized to mail such process or a true copy thereof. The service of process as set forth above and below is cumulative to any other methods which may be provided by law for service of process upon **Insurer**.

IV. **THE INSURER HEREBY MODIFIES THE LANGUAGE IN THE ENDORSEMENT ABOVE IN EACH APPLICABLE STATE AS SET FORTH BELOW TO COMPLY WITH THE DISCLOSURES AND REQUIREMENTS OF THAT STATE:**

A. **Alaska**. **Insurer** may be sued upon a cause of action arising in Alaska under this **Policy**, pursuant to the procedures set forth in AS 21.33. Further, by assuming surplus lines insurance, **Insurer** subjects itself to Chapter 31 of the Alaska Insurance Code.

B. **Arizona.** By issuing or delivering a surplus lines policy through a surplus lines broker in Arizona, **Insurer** is conclusively deemed to have irrevocably appointed the Arizona Director of Insurance as our agent for acceptance of service of all legal process issued in Arizona in any action or



proceeding under or arising out of such policy, and service of the process on the director is lawful personal service on **Insurer**.

**C.  Arkansas. Insurer** may be sued upon a cause of action arising in Arkansas under this **Policy**, pursuant to the procedures set forth in Ark. Code Ann. § 23-65-203.

**D.  California. Insurer** may be sued upon any cause of action arising in California under this **Policy**, or any evidence of such insurance issued or delivered by the surplus line broker, pursuant to the procedures set forth in Cal. Ins. Code §§ 1610 to 1620, inclusive. Further, by assuming surplus line insurance, **Insurer** subjects itself to Chapter 6 of the California Insurance Code.

**E.  Colorado.** In any cause of action arising under this **Policy**, **Insurer** may be sued in the district court of the county in which the cause of action arose. Service of legal process may be made in any such action by service upon the Commissioner of the Department of Insurance of Colorado as provided in Colo. Rev. Stat. Ann. § 10-5-114. The commissioner shall forthwith mail a copy of the process served to the person designated in Section II of this Endorsement, by prepaid registered mail with return receipt requested. **Insurer** shall have forty (40) days from the date of service upon the Commissioner within which to plead, answer, or otherwise defend the action. Upon service of process upon the commissioner in accordance with Colo. Rev. Stat. Ann. § 10-5-114, the court shall be deemed to have jurisdiction in personam over **Insurer**.

**F.  Delaware. Insurer** shall be sued upon any cause of action arising in Delware under any contract issued by **Insurer** as a surplus line contract pursuant to Delaware surplus lines law, in the Superior Court of Delaware. Service of legal process against **Insurer** may be made in any such action by service of two (2) copies upon the Commissioner of the Department of Insurance of Delaware and payment of the service of process fee as specified in Del. Code Ann tit. 18 § 701. The Commissioner shall in like manner mail a copy of the process served to the person designated in Section II of this Endorsement. Upon service of process upon the Commissioner in accordance with Del. Code Ann. tit. 18, § 1934, the court shall be deemed to have jurisdiction in personam over **Insurer**.

**G.  Georgia. Insurer** hereby designates the Georgia Insurance Commissioner as **Insurer's** true and lawful attorney, upon whom may be served all lawful process in any action, suit or proceeding arising out of any insurance **Insurer** writes delivered pursuant to Georgia. Code Ann. §§ 33-5-20 through 33-5-35, inclusive.

**H.  Hawaii. Insurer** may be sued upon any cause of action arising in Hawaii under this **Policy**, or any evidence of such insurance issued or delivered by the surplus line broker, pursuant to the procedures set forth in Hawaii Rev. Stat. § 431:2. Further, by assuming surplus line insurance, **Insurer** subjects itself to Chapter 8 of the Hawaii Insurance Code.

**I.  Idaho. Insurer** shall be sued upon any cause of action arising in Idaho under any contract issued by **Insurer** as a surplus line contract pursuant to Idaho surplus lines law, in the district court of the county in which the cause of action arose. Service of legal process against **Insurer** may be made in any such action by service upon the Director of the Department of Insurance of Idaho as provided in Idaho Code Ann. § 41-334(1). The director shall forthwith mail a copy of the process served to the person designated in Section II of this Endorsement, by prepaid registered mail with return receipt requested. **Insurer** shall have thirty (30) days from the date of service upon the director within which to plead, answer, or otherwise defend the action. Upon service of process upon the director in accordance with Idaho Code Ann. § 41-1231 the court shall be deemed to have jurisdiction in personam over **Insurer**.

 cowbell®

**J.  Illinois.** **Insurer** hereby designates the Illinois Director of Insurance and his successors in office as **Insurer's** true and lawful attorney, upon whom may be served all lawful process in any action, suit or proceeding arising out of any insurance **Insurer** writes delivered pursuant to 215 Ill. Comp. Stat. § 5/445.

**K.  Iowa.** **Insurer** may be sued upon a cause of action arising in Iowa under a surplus lines insurance policy or contract placed by **Insurer** or upon evidence of insurance placed by **Insurer** and issued or delivered in Iowa by a surplus lines insurance producer.  Any service of legal process against **Insurer** may be made in any such action by service upon the person designated in Section II of this endorsement.

**L.  Kentucky.** **Insurer** shall be sued upon any cause of action arising in Kentucky under any contract issued by **Insurer** as a surplus lines contract pursuant to subtitle 10 of the Kentucky Insurance Code, in the Circuit Court of the county in which the cause of action arose. Any service of legal process against **Insurer** may be made in any such action by service upon the Secretary of State of the State of Kentucky as provided in Ky. Rev. Stat. Ann. § 304.3- 230(5).  The Secretary of State shall mail process to the person designated in Section II of this endorsement.

**M.  Louisiana.** **Insurer** shall be sued, upon any cause of action arising in Louisiana under any contract issued by **Insurer** as a surplus lines contract pursuant to Chapter 2, Part 1, Subpart O of the Louisiana Insurance Code, in the district court of the parish in which the cause of action arose.  Service of legal process against **Insurer** may be made in any such action by service upon the secretary of state of Louisiana or some other person in his office whom he may designate during his absence.  The secretary of state shall forthwith mail the documents of process served, or a true copy thereof, to the person designated in Section II of this Endorsement by registered or certified mail or by commercial courier as defined in La. Rev. Stat. Ann. tit. § 13:3204(D).  **Insurer** shall have forty (40) days from the date of service upon the secretary of state within which to plead, answer, or otherwise defend the action. Upon service of process upon the secretary of state in accordance with this provision, the court shall be deemed to have jurisdiction in personam over **Insurer**.

**N.  Maine.** **Insurer** shall be sued, upon any cause of action arising in Maine under any contract issued by **Insurer** as a surplus lines contract pursuant to Title 24-a, Chapter 19, Section 2019 of the Maine Insurance Code, in the Superior Court.  Service of legal process against the **Insurer** may be made in any such action by service of 2 copies upon the person designated in Section II of this endorsement. Upon service of process in accordance with this provision, the court is deemed to have jurisdiction in personam of **Insurer.**

**O.  Michigan.** **Insurer** hereby appoints the Michigan Insurance Commissioner as **Insurer's** resident agent for the purposes of service of process in Michigan.

**P.  Mississippi.** **Insurer** may be sued upon any cause of action arising in Mississippi under any contract issued by it as authorized by the Mississippi Insurance Code, in a court of competent jurisdiction in any county in which the plaintiff may reside, or in which the cause of action arose. **Insurer** hereby authorizes service of citation or other legal process upon the Mississippi Commissioner of Insurance, who shall mail citation or other document or process required to the person identified in Section II of the endorsement for the purpose by registered mail or certified mail with return receipt requested.

**Q.  Missouri.** **Insurer** may be sued upon any cause of action arising in Missouri under any surplus lines insurance contract made by **Insurer** or evidence of insurance issued or delivered by the surplus lines licensee pursuant to the procedure provided in Mo. Ann. Stat. §§375.256-375.266.

 cowbell®

Insurer hereby appoints the director of the department of commerce and insurance of the state of Missouri, and his successor or successors in office upon whom may be served all lawful process in any action, suit, or proceeding instituted in any county in this state, by or on behalf of **Insured** or beneficiary arising out of any contract of insurance, who shall mail process to the person indicated in Section II of this endorsement.

R. **Nevada. Insurer** may be sued in a district court of Nevada under any insurance contract entered into by it under Title 57, Chapter 685.a of the Nevada Insurance Code. Service of legal process against **Insurer** may be made in any such action by service of two copies thereof upon the Commissioner or an authorized representative of the Commissioner and payment of the fee specified in NRS 680B.010. The Commissioner or an authorized representative of the Commissioner shall forthwith mail a copy of the process served to the person indicated in Section II of this endorsement for the purpose by prepaid registered or certified mail with return receipt requested. For the purposes of this provision, "process" includes only a summons, or the initial documents served in an action. The Commissioner or an authorized representative of the Commissioner is not required to serve any documents after the initial service of process. **Insurer** has 40 days from the date of service of the summons and complaint upon the Commissioner or an authorized representative of the Commissioner within which to plead, answer or defend any such suit. Upon service of process upon the Commissioner or an authorized representative of the Commissioner and its mailing in accordance with this provision, the court shall be deemed to have jurisdiction in personam of **Insurer**.

S. **New Mexico. Insurer** shall be sued, upon any cause of action arising in New Mexico under any surplus line insurance policy issued by it, in the district court of the county in which the cause of action arose. Service of legal process against **Insurer** may be made in any such action by service upon the superintendent as provided for in Section 99 of the New Mexico Insurance Code. The superintendent shall forward legal process served upon him to the person designated in Section II of this endorsement.

T. **New York. Insurer** designates the New York superintendent or his successors in office the **Insurer's** true and lawful attorney upon whom may be served all lawful process in any proceeding instituted by or on behalf of **Insured** or a beneficiary arising out of any contract effectuated in accordance with (i) subsection (b) or (c) of Section 2117 or (ii) Section 2105 of Chapter 28 of the New York Code of Insurance.

U. **North Carolina.** In any cause of action arising under this Policy, **Insurer** may be sued in North Carolina. For any action commenced in North Carolina, service of process on **Insurer** shall be made pursuant to the procedures in N.C.G.S.A 58-16-30. **Insurer** hereby designates the North Carolina Insurance Commissioner as the true and lawful person upon whom any lawful process may be served in any action, suit or proceeding instituted by or on behalf of the Named Insured.

V. **Oklahoma. Insurer** hereby designates the Oklahoma Insurance Commissioner as **Insurer's** true and lawful attorney, upon whom may be served all lawful process in any action, suit or proceeding arising out of any insurance **Insurer** writes delivered pursuant to Okla. Stat. Ann. tit. 36 §§1100 through 1120.

W. **Oregon. Insurer** may be sued upon any cause of action arising in Oregon under this **Policy**, or any evidence of such insurance issued or delivered by the surplus line broker, pursuant to the procedures set forth in ORS 735.490. Further, by assuming surplus line insurance, **Insurer** subjects itself to ORS 735.400 to 735.495.

 cowbell®

X. **Pennsylvania.** In any cause of action arising under this policy or evidence of insurance issued or delivered by a surplus lines licensee, **Insurer** may be sued in the Commonwealth of Pennsylvania. For any action commenced in the Commonwealth of Pennsylvania, any service of process on **Insurer** shall be made pursuant to the procedures provided by 42 Pa.C.S. Ch. 53 Subch. B (relating to interstate and international procedure). **Insurer** is deemed thereby to have subjected ourselves to accepting service of process under 42 Pa.C.S. Ch. 53 Subch. B. **Insurer** hereby designates the Pennsylvania Insurance Commissioner as the true and lawful person upon whom any lawful process may be served in any action, suit or proceeding instituted by or on behalf of the Named Insured.

Y. **Puerto Rico.** In any action brought in Puerto Rico under an insurance contract issued as a surplus line pursuant to Title 26, Subtitle 1, Chapter 10, by **Insurer**, duplicate copies of legal process shall be served upon the Commissioner of Insurance of the Commonwealth of Puerto Rico. The Commissioner shall forthwith mail one copy of the process so served to the person designated in Section II of this Endorsement, by registered mail with return receipt requested. Upon service of process upon the Commissioner and such mailing of process, the court shall be deemed to have jurisdiction in personam over **Insurer**. **Insurer** shall have forty-five days after such date of mailing within which to plead, answer, or otherwise defend the action. At time of such service of process the plaintiff shall pay to the Commissioner three dollars, taxable as costs in the action.

Z. **South Dakota.** Any cause of action against **Insurer** arising in South Dakota on a surplus line contract shall be brought in the circuit court for the county in which the cause of action arose. Service of legal process against **Insurer** may be made in any such action by service upon the South Dakota director of the Division of Insurance as provided in S.D. Codified Laws § 58-6-39. The director shall forthwith mail a copy of the process served, to the person designated in Section II of this Endorsement, by prepaid registered or certified mail with return receipt requested. **Insurer** shall have thirty days from the date of service upon the director within which to plead, answer, or otherwise defend the action. Upon service of process upon the director in accordance with S.D. Codified Laws § 58-6-38, the court shall be deemed to have jurisdiction in personam over **Insurer**. By issuing a surplus lines policy, **Insurer** is deemed thereby to have authorized service of process against **Insurer** in the manner and to the effect as provided in S.D. Codified Laws § 58-6-37.

AA. **Tennessee. Insurer** may be sued upon any cause of action arising in Tennessee under any surplus lines insurance contract issued by **Insurer** or certificate, cover note or other confirmation of the insurance issued by the surplus lines agent, pursuant to the same procedure as is provided for unauthorized insurers in Title 56, Chapter 2, Part 6 and Tenn. Code Ann. § 56-7-105(b) of the of Tennessee Insurance Law. By assuming a surplus lines insurance risk pursuant to Title 56, Chapter 14, Part 1, **Insurer** is deemed to have subjected ourselves to the requirements of Tenn. Code Ann. § 56-14-112.

BB. **Texas. Insurer** may be sued on any cause of action arising in Texas under any surplus lines insurance contract issued by **Insurer** or under any certificate, cover note, or other confirmation of that insurance issued by the surplus lines agent, under the same procedure as is provided for unauthorized insurers in Sections 7.1404, 7.1410, and 7.1411 of Title 28 of the Texas Administrative Code (relating to Service of Process Procedure for Domestic Insurers Approved To Operate under the Insurance Code, Article 1.28, Foreign and Alien Insurance Companies, Risk Retention Groups, Purchasing Groups, Third Party Administrators, Unauthorized Persons or Insurers, Organizations Formed under the Insurance Code, Article 3.71, and Surplus Lines Insurers; Service of Process on Commissioner on Behalf of Unauthorized Persons or Insurers; and Service of Process, Notice, Order, or Pleading on Secretary of State on Behalf of



Unauthorized Persons and Insurers).  By assuming a surplus lines risk under Chapter 981 of the Texas Insurance Code, **Insurer** is subject to Tex. Ins. Code Ann. § 804.106. Any act of engaging in the business of insurance by **Insurer**, an eligible surplus lines insurer, constitutes the irrevocable appointment by **Insurer** of the Texas Secretary of State as agent for service of process arising from our engagement of the business of insurance in Texas, other than service of process for an action or proceeding by the department or state, and signifies our agreement that service under Tex. Ins. Code Ann. § 804.106 has the same effect as personal service on **Insurer** or our successor in interest. The plaintiff shall supply the address provided in Section II of this Endorsement in any citation served under Tex. Ins. Code Ann. § 804.106. Service of process as set forth in this Endorsement is in addition to any other method provided by law for service of process on a surplus lines insurer, including the method provided by Chapter 804, Subchapter C of the Texas Insurance Code.

CC. **Washington.**  For any cause of action arising in Washington under any contract issued as a surplus line contract under Chapter 48.15 of the Washington Insurance Code, **Insurer** must be sued in the superior court of the county in which the cause of action arose.  By issuing a policy under Chapter 48.15, **Insurer** has authorized service of process against **Insurer** in the manner prescribed under Wash. Rev. Code § 48.02.200. **Insurer** hereby designates the Washington Commissioner of Insurance as the person upon whom such service of process may be made.

DD. **West Virginia.** **Insurer** may be sued upon any cause of action arising in West Virginia under any surplus lines insurance contract made by **Insurer** or evidence of insurance issued or delivered by the surplus lines licensee pursuant to the procedure provided in W. VA. Code § 33-12C-10.

EE. **Wyoming. Insurer** shall be sued, upon any cause of action arising in Wyoming under any contract issued by **Insurer** as a surplus lines contract pursuant to Title 26, Chapter 11 of the Wyoming Insurance Code, in the district court of the county in which the cause of action arises. Service of legal process against the **Insurer** may be served upon the commissioner as provided in Wyo Stat. Ann. § 26-3-122. The commissioner shall immediately mail a copy of the process to the person designated in Section II of this endorsement. Upon service of process in accordance with this provision, the court is deemed to have jurisdiction in personam of **Insurer.**

**All other terms and conditions of this Policy remain unchanged.**

Policy Number    OBD-CB-S3DTFHJ57-002      Issue Date: Aug 15, 2023
     Effective Date: Aug 12, 2023



# CALIFORNIA CONSUMER PRIVACY ACT (CCPA) ENDORSEMENT

Solely for the purpose of coverage under this endorsement it is understood and agreed the following changes are made to the **Policy**:

**A.** SECTION I.**C.** **LIABILITY EXPENSE** COVERAGE is amended by the addition of the following under **Liability Expense**:

**(4) California Consumer Privacy Act (CCPA) Costs**

**B.** SECTION II. DEFINITIONS of the Policy is amended by the removal and replacement of Section II.AAA with the following:

**AAA. Personally Identifiable Information** means:
    **(1)** any information from which an individual may be uniquely and reliably identified or contacted, including but not limited to an individual's name, telephone number, email address, social insurance number, social security number, medical or healthcare data or other protected health information, biometric record, driver license number, state, provincial, or territorial identification number, account number, credit card number, debit card number, or access code or password that would permit access to that individual's financial account;
    **(2)** any other non-public personal information as defined in **Privacy and Security Regulations**;
    **(3)** all personal data as defined by the **CCPA** in connection with a **CCPA Proceeding**; and
    **(4)** with the exception of personal data as defined by the **CCPA**, does not include information lawfully available to the general public for any reason, including but not limited to information from federal, state, provincial, territorial, municipal, or other local government records.

**C.** SECTION II. DEFINITIONS of the **Policy** is amended by the addition of the following definitions:

**California Consumer Privacy Act (CCPA) Costs** means amounts the **Insured** is legally obligated to pay in responding to a **CCPA Proceeding** that directly results from a **Privacy Incident** or a **Network Security Incident** that takes place during the **Policy Period** or Extended Reporting Period.

**CCPA** means the **California Consumer Privacy Act** (Section 1798.100 of California Civil Code) and any amendment thereto. CCPA shall also include any state, provincial, territorial, local, or federal regulations enacted in furtherance of or pursuant to implementation of the **California Consumer Privacy Act** and any modifications and amendment thereto.

**CCPA Proceeding** means a formal investigation of or an administrative adjudication proceeding against an Insured concerning **CCPA** by an administrative or regulatory agency, including an appeal thereof, commenced by the Insured's receipt of a subpoena, investigative demand, complaint, or similar document.

**D.** Item 5. of this **Policy's** Declarations is amended by the addition of the following:

| Coverage | Included (yes/no) | Each **Claim** Limit of Liability | Deductible / Waiting Period | Retroactive Date |
|----------|-------------------|-----------------------------------|-----------------------------|------------------|
| CCPA Costs | Yes | $1,000,000.00 | $5,000.00 | Full Prior Acts |

All other terms and conditions of this Policy remain unchanged.

Policy Number:  OBD-CB-S3DTFHJ5Z-002

Issue Date: Aug 15, 2023
Effective Date: Aug 12, 2023



# GENERAL DATA PROTECTION REGULATION (GDPR) ENDORSEMENT

Solely for the purpose of coverage under this endorsement it is understood and agreed the following changes are made to the **Policy**:

**A.** SECTION I.**C. LIABILITY EXPENSE** COVERAGE is amended by the addition of the following under **Liability Expense**:

**(4) General Data Protection Regulation (GRPR) Costs**

**B.** SECTION II. DEFINITIONS of the **Policy** is amended by the removal and replacement of II.AAA with the following:

**AAA. Personally Identifiable Information** means:
(1) any information from which an individual may be uniquely and reliably identified or contacted, including but not limited to an individual's name, telephone number, email address, social insurance number, social security number, medical or healthcare data or other protected health information, biometric record, driver license number, state, provincial, or territorial identification number, account number, credit card number, debit card number, or access code or password that would permit access to that individual's financial account;
(2) any other non-public personal information as defined in **Privacy and Security Regulations**; and
(3) all "personal data" as defined by the **GDPR**; and
(4) with the exception of "personal data" as defined by the **GDPR**, does not include information lawfully available to the general public for any reason, including but not limited to information from federal, state, provincial, territorial, municipal, or other local government records.

**C.** SECTION II. DEFINITIONS of the Policy is amended by the addition of the following definitions:

**General Data Protection Regulation (GRPR) Costs** means amounts the **Insured** is legally obligated to pay in responding to a **GDPR Proceeding** that directly results from a **Privacy Incident** or a **Network Security Incident** that takes place during the **Policy Period** or Extended Reporting Period.

**D.** Item 5. of this Policy's Declarations is amended by the addition of the following:

| Coverage | Included (yes/no) | Each **Claim** Limit of Liability | Deductible / Waiting Period | Retroactive Date |
|---|---|---|---|---|
| GDPR Costs | Yes | $1,000,000.00 | $5,000.00 | Full Prior Acts |

**All other terms and conditions of this Policy remain unchanged.**

Policy Number:    OBD-CB-S3DTFHJ57-002                                  Issue Date: Aug 15, 2023
                                                                       Effective Date: Aug 12, 2023



# UTILITY FRAUD ATTACK

Solely for the purpose of coverage under this endorsement it is understood and agreed the following changes are made to the **Policy**:

**A.** The following limit and deductible applies solely to the coverage provided in this endorsement:

| Coverage | Each **Claim** Limit of Liability | Deductible / Waiting Period |
|---|---|---|
| Utility Fraud Attack | $100,000.00 | $5,000.00 |

**B.** SECTION II. DEFINITIONS, Items **L.** and **M.** of the **Policy** are deleted in their entirety and replaced with the following:

**L. Cyber Crime Incident** means:
   **(1) Telecommunications Hack**;
   **(2) Social Engineering Attack**;
   **(3) Reverse Social Engineering Attack**;
   **(4) Transfer of Funds Loss**; or
   **(5) Utility Fraud Attack**.

**M. Cyber Crime Loss** means:
   **(1)** charges incurred by the **Insured** from its telecommunications provider, directly resulting from a **Telecommunications Hack**; and
   **(2)** loss of funds directly resulting from any of the following:
      **(a) Social Engineering Attack**;
      **(b) Reverse Social Engineering Attack**;
      **(c) Transfer of Funds Loss**; or
      **(d) Utility Fraud Attack**.

   **Cyber Crime Loss** does not include any amounts reimbursed or reversed by a financial institution.

**C.** SECTION II. DEFINITIONS of the **Policy** is amended by the addition of the following definitions:

**Utility Fraud Attack** means additional amounts incurred by the manipulation or deception, by an unauthorized third party for its use of the **Insured Organization's** natural gas, oil, or internet (the "**Utilities**"); provided, however, that such additional costs for the **Utilities** are:
   **(1)** incurred pursuant to a written contract between the **Insured Organization** and the respective utility provider, which was executed before the **Utility Fraud Attack** first occurred;
   **(2)** billed to the **Insured Organization** by statements issued by the respective utility provider, which include usage or consumption information;
   **(3)** not charged to the **Insured Organization** at a flat fee that does not scale with the rate or use of the respective utility; and
   **(4)** incurred pursuant to statements issued by the respective utility provider and due for payment during the **Policy Period**.

All other terms and conditions of this Policy remain unchanged.

Policy Number:   OBD-CB-S3DTFHJ5Z-002

Issue Date: Aug 15, 2023
Effective Date: Aug 12, 2023

 cowbell®

# MEDIA LIABILITY ENDORSEMENT

Solely for the purpose of coverage under this endorsement it is understood and agreed the following changes are made to the **Policy**:

**A.** SECTION II. DEFINITIONS of the **Policy** is amended by the removal and replacement of II.OO. with the following:

**OO. Media Incident** means any actual or alleged:

**(1)** Defamation, slander, libel, or product disparagement alleged by a person or organization that claims to have been defamed, slandered or libeled, or by a person or organization that claims that his, her or its products have been disparaged;

**(2)** Appropriation of name or likeness or publicity that places a person in a false light; or public disclosure of private facts;

**(3)** Infringement of title, slogan, trademark, trade name, trade dress, service mark or service name;

**(4)** Copyright infringement, plagiarism, or misappropriation of information or ideas; or

**(5)** Improper deep linking or framing;

directly resulting from the **Insured Organization's** business in the course of gathering communicating, reproducing, publishing, disseminating, displaying, releasing, transmitting, or disclosing **Media Material**, including social media authorized by the **Insured** to the public.

**Media Incident** shall not include false advertising or labeling on the **Insured's** products of services.

**B.** SECTION II. DEFINITIONS of the **Policy** is amended by the addition of the following definition:

**Media Material** means any data, text, sounds, numbers, images, graphics, videos, streaming content, webcasts, podcasts, or blogs but does not mean computer software or the actual goods, products, or services described, referenced, illustrated, or displayed in such **Media Material**.

**All other terms and conditions of this Policy remain unchanged.**

**Exhibit A to Joint Summary Judgment Stipulations**
**Page 47 of 66**

Policy Number:   OBD-CB-S3DTFHJ5Z-002

Issue Date: Aug 15, 2023
Effective Date: Aug 12, 2023



## COWBELL BREACH FUND SEPARATE
## LIMIT ENDORSEMENT

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

**I.**   Section IV.A. Limit of Insurance and Deductible is deleted and replaced by the following:

   A.   Limit of Insurance and Deductible

<u>Aggregate Limit of Liability & Limits of Liability for All Amounts Other than the Cowbell Breach Fund</u>

The Aggregate Limit of Liability set forth in Item 3. Of the Declarations is the maximum amount the **Insurer** will be liable to pay for all **Claims**, **First Party Loss**, **First Party Expense**, and **Liability Expense**, regardless of the number of **Claims**, **Privacy Incidents**, **Network Security Incidents**, **Cyber Crime Incidents**, **Media Incidents**, or **Insureds**.

The Limits of Liability set forth in Item 5. of the Declarations is the maximum amount the **Insurer** will be liable to pay for all **Claims**, **First Party Loss**, **First Party Expense**, and **Liability Expense** under each Insuring Agreement, regardless of the number of **Claims**, **Privacy Incidents**, **Network Security Incidents**, **Cyber Crime Incidents**, **Media Incidents**, or **Insureds**. Such Limits of Liability are part of, and not in addition to, the Aggregate Limit of Liability.

Limits of Liability for an Optional Extended Reporting period, if applicable, will be part of, and not in addition to, the Aggregate Limit of Liability set forth in Item 7. of the Declarations.

<u>Limit of Liability for Cowbell Breach Fund</u>

The Cowbell Breach Fund Limit of Liability set forth in Item 5. of the Declarations is the maximum amount the **Insurer** will be liable to pay for all **Forensics**, **Notifications**, **Identity Monitoring Services**, **Incident Response**, **Crisis Management**, **Incident Consultation**, **Overtime Salaries**, and **Healthcare Records Remediation Services**, regardless of the number of **Claims**, **Privacy Incidents**, **Network Security Incidents**, **Cyber Crime Incidents**, **Media Incidents**, or **Insureds**. The Cowbell Breach Fund Limit of Liability set forth in Item 5. of the Declarations is in addition to the Aggregate Limit of Liability.

<u>Deductible</u>

(1)   The **Insurer** will only be liable for those amounts payable under this **Policy** which are in excess of the applicable Deductible(s). Such Deductibles must be paid directly by the **Insured** and cannot be insured or paid by another insurance policy.

(2)   In the event more than one Deductible/**Waiting Period** applies to any **Claim**, **First Party Loss**, **First Party Expense**, or **Liability Expense**, the maximum total Deductible/**Waiting Period** applicable to such **Claim**, **First Party Expense**, or **Liability Expense** shall be the largest of the applicable Deductible/**Waiting Period**.

(3)   With respect to Insuring Agreements 5.II.B.(1) to 5.II.B.(4), the applicable Deductible/**Waiting Period** is the greater of:

(a) the applicable dollar Deductible amount; or
(b) the **Waiting Period**
set forth in Item 5. of the Declarations for the respective Insuring Agreement. **Business Interruption Loss**, **Contingent Business Interruption Loss**, and **Extra Expense** applicable to the Deductible/**Waiting Period** shall be computed at the start of the **Interruption of Service**.

(4) With respect to Insuring Agreement I.A.5., we shall pay only **Reputational Harm Expense** in excess of the **Negative Publicity Waiting Period** listed under Item 5.I.A.(5).

Policy Number    OBD-CB-S3DTFHJ5Z-002

Issue Date: Aug 15, 2023
Effective Date: Aug 12, 2023



## CONTINGENT BODILY INJURY AND PROPERTY DAMAGE ENDORSEMENT

Solely for the purpose of coverage under this endorsement it is understood and agreed the following changes are made to the **Policy**:

**A.** Item 5. of this Policy's Declarations is amended by the addition of the following:

| Coverage | Included (yes/no) | Each **Claim** Limit of Liability | Deductible / Waiting Period | Retroactive Date |
|---|---|---|---|---|
| Contingent Bodily Injury and Property Damage | Yes | $250,000.00 | $25,000.00 | 08/12/2023 |

**B.** Paragraph D. Property Damage and Bodily Injury under Section III. EXCLUSIONS is deleted for purposes of the coverage provided under this endorsement only.

**C.** SECTION II. DEFINITIONS is amended by the addition of:

**Contingent Bodily Injury and Property Damage** means that the **Insurer** will pay on the **Insured's** behalf any actual or alleged **Liability Expenses** the **Insured** incurs for :

(1) bodily injury, sickness disease, or death of a person resulting directly from a **Network Security Incident;**
(2) damage or injury to or destruction of tangible property resulting directly from a **Network Security Incident**;
(3) impairment to or loss of use of tangible property, whether physically damaged, injured, destroyed or not, including tangible property that cannot be accessed, used, or is less useful resulting directly from a **Network Security Incident.**

provided such the **Network Security Incident** is first discovered by the **Insured** during the **Policy Period**.

Furthermore, this extension of coverage applies only if:

(1) such **Claim** for **Contingent Bodily Injury and Property Damage** is not covered under any other policy of insurance; and
(2) solely affecting the **Insured Organization's Computer Systems** which is orwerise covered under the terms and conditions of this **Policy**; but not if the **Insured's** own act, error or omission is the direct immediate cause of such **Claim.**

**D.** The **Insurer's** aggregate limit of liability for all **Liability Expenses** resulting from all **Claims** covered under this Endorsement, made against any **Insured(s)** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any **Contingent Bodily Injury and Property Damage** shall be $<Sublimit>, which amount shall be part of and not in addition to the Policy Aggregate Limit of Liability.

**All other terms and conditions of this Policy remain unchanged.**

Issue Date: Aug 15, 2023
Effective Date: Aug 12, 2023

 cowbell®

## MISSED BID ENDORSEMENT (CONSTRUCTION INDUSTRY)

Solely for the purpose of coverage under this endorsement it is understood and agreed the following changes are made to the **Policy**:

**A.** The following limit and deductible applies solely to the coverage provided in this endorsement:

| Coverage | Each **Claim** Limit of Liability | Deductible |
|---|---|---|
| Missed Bid | $1,000,000.00 | $25,000.00 |

**B.** SECTION II. DEFINITIONS of the **Policy** is amended by the removal and replacement of II.GG with the following:

**GG. Income Loss** means:
(1) the **Insured Organization's** measurable net profit before income taxes that the **Insured Organization** would have earned had no intervening event not taken place, or the net loss before income taxes the **Insured Organization** is unable to avoid, during the **Period of Recovery**.
(2) the net profit or net loss before taxes and interest that the **Insured Organization** could have reasonably earned or net loss that you could have reasonably avoided due to a missed bid or request for proposal (RFP), and the costs of retaining a forensic accountant to determine such amount.

**All other terms and conditions of this Policy remain unchanged.**

**Exhibit A to Joint Summary Judgment Stipulations**
**Page 51 of 66**

Policy Number: OBD-CB-S3DTFHJ5Z-002

Issue Date: Aug 15, 2023
Effective Date: Aug 12, 2023

 cowbell®

## AMENDATORY CONSTRUCTION ENDORSEMENT

Solely for the purpose of coverage under this endorsement it is understood and agreed the following changes are made to the **Policy**:

**A.** SECTION II. DEFINITIONS of the **Policy** is amended by the removal and replacement of II.H with the following:

**H. Computer System** means:
   **(1)** Computer hardware;
   **(2) Software**;
   **(3)** Firmware and associated input and output devices;
   **(4)** Mobile and wireless devices;
   **(5)** Data storage devices;
   **(6)** Networking equipment;
   **(7)** Storage area network;
   **(8)** Backup facilities;
   **(9)** Unmanned aerial vehicles ('drones") and wearable technology devices, but only while such equipment is operated or worn by an Insured within the scope of such Insured's duties in the course of work performed on your behalf; and

**Computer System** also means any of the foregoing that are:
   **(a)** part of an Industrial Control System (ICS), which are controls, systems and instrumentation used to operate or automate industrial processes; or
   **(b)** operated by and either owned by or leased to the **Insured Organization**; or
   **(c)** systems operated by a third-party service provider and used for the purpose of providing hosted computer application services, including cloud services, to the **Insured Organization** or for processing, maintaining, hosting or storing the **Insured Organization's Electronic Data**, pursuant to written contract with the **Insured Organization** for such services.

And removal and replacement of II.OOO with the following:

**OOO. Software** means operations and applications, codes and programs by which **Electronic Data** are electronically collected, transmitted, processed, stored, or received. **Software** also means any construction project planning software, platforms, tools, and systems, including, but not limited to: 1. Computer-aided design ('CAD") programs; 2. Wrap programs; or 3. Building Information Modeling tools. **Software** does not include **Electronic Data**.

**All other terms and conditions of this Policy remain unchanged.**

Policy Number:    OBD-CB-S3DTFHJ5Z-002

Issue Date: Aug 15, 2023
Effective Date: Aug 12, 2023

cowbell®

# AMEND COOPERATION CLAUSE ENDORSEMENT

Solely for the purpose of coverage under this endorsement it is understood and agreed the following changes are made to the **Policy**:

SECTION IV. GENERAL TERMS AND CONDITIONS, Item **B**. Defense and Settlement, is deleted in its entirety and replaced with the following:

**B**. Defense and Settlement

The **Insurer** has the right and duty to defend, and the right to select counsel to defend an **Insured** against any **Claim**, even if the allegations of the **Claim** are groundless, false or fraudulent. The **Insurer's** duty to defend will cease upon the exhaustion of the **Liability Expense** aggregate limit of liability as indicated in Item 5.I.C.(1) of the Declarations. The **Insured** agrees not to make any payment, participate in any settlement, admit liability, assume obligation or incur any **First Party Loss, First Party Expense,** or **Liability Expense** without the prior written consent of the **Insurer**, which consent will not be unreasonably withheld. The **Insured** must provide the **Insurer** with full assistance and cooperation and must provide all information deemed necessary to investigate any **Privacy Incident**, **Network Security Incident** or **Media Incident**, settle any **Claim**, or pay any **First Party Loss, First Party Expense,** or **Liability Expense.**

If the **Insured** refuses to consent to any settlement or compromise recommended by the **Insurer** and acceptable to the claimant, the **Insurer's** liability for such **Claim** will not exceed:

1. the amount for which such **Claim** could have been settled plus **Defense Expenses** incurred up to the time and date the **Insured** refused to settle such **Claim**; and
2. 80.0__ percent (80.0_____%) of **Liability Expenses** incurred after such settlement was refused by the **Insured,**

in excess of the amount such **Claim** could have settled under such settlement. The remaining **Liability Expenses** shall be borne by, or on behalf of, the **Insured** at its own risk.

**All other terms and conditions of this Policy remain unchanged.**

Policy Number:   OBD-CB-S3DTFHJ5Z-002                    Issue Date: Aug 15, 2023
                                                         Effective Date: Aug 12, 2023



# BLANKET ADDITIONAL INSURED COVERAGE

Solely for the purpose of coverage under this endorsement it is understood and agreed the following changes are made to the **Policy**:

**A.**  SECTION IV. is amended by the addition of the following:

Additional Insured Coverage

For purposes of coverage provided by this endorsement, Additional Insured means any person(s) or organization(s) the **Insured Organization** has agreed in a written contract or agreement to add as an Additional Insured to a policy providing the type of coverage afforded by this **Policy**.

The Insurer shall pay on behalf of any Additional Insured all **Liability Expense** for any **Claim** made against such Additional Insured provided that:

**a)**  prior to such **Claim** being made against the Additional Insured, the **Insured Organization** entered into a written agreement with the Additional Insured that requires the **Insured Organization** to Indemnify such Additional Insured;

**b)**  such coverage is limited to **Liability Expense** which, had the **Claim** been made against an **Insured**, would be covered under this Policy; and

**c)**  such **Claim** against the Additional Insured is solely as a result of a **Privacy Incident**, **Network Security Incident** or **Media Incident**.

**B.**  Provided parts a) through c) of the Additional Insured Coverage apply to such **Claim** against an Additional Insured, Section II.HH.. is amended by the addition of the following:

**Insured** shall also mean "Additional Insured."

**All other terms and conditions of this Policy remain unchanged.**

Policy Number   OBD-CB-S3DTEHJ5Z-002

Issue Date: Aug 15, 2023
Effective Date: Aug 12, 2023



# BIPA EXCLUSION ENDORSEMENT

This endorsement modifies the insurance provided under the following:

**COWBELL CYBER RISK INSURANCE POLICY – PRIME 250**

SECTION III. EXCLUSIONS of the Policy is amended by adding the following:

> Any actual or alleged violation of the Illinois Biometric Information Protection Act, or any amendments to the foregoing, or related federal, state or international law related to the collection of biometric information.

> Any actual or alleged unlawful or unauthorized collection of biometric information.

**All other terms and conditions of this Policy remain unchanged.**

Policy Number    OBD-CB-S3DTFHJ57-002                    Issue Date: Aug 15, 2023
                                                        Effective Date: Aug 12, 2023



# CYBER TERRORISM AMENDATORY ENDORSEMENT

Solely for the purpose of coverage under this endorsement it is understood and agreed the following changes are made to the Policy:

C. SECTION II. O. DEFINITIONS of the Policy is deleted and replaced by the following definition:

**Cyberterrorism** means the use of information technology to execute attacks or threats by any person or group, whether acting alone, or on behalf of, or in connection with, any individual, organization, or government, with the intention to:

    **(1)** cause harm;
    **(2)** intimidate any person or entity; or
    **(3)** cause destruction or harm to critical infrastructure or data, in furtherance of financial, social, ideological, religious, or political objectives;

which results in a threat or harm to **Your Network Security**.

**Cyberterrorism** does not include any activity which is part of or in support of any military action, war, or war-like operation.

**All other terms and conditions of this Policy remain unchanged.**

**Exhibit A to Joint Summary Judgment Stipulations**
**Page 56 of 66**

Policy Number:    OBD-CB-S3DTFHJ5Z-002                    Issue Date: Aug 15, 2023
                                                          Effective Date: Aug 12, 2023



# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT THIS ENDORSEMENT DOES NOT GRANT COVERAGE OR CHANGE THE TERM AND CONDITIONS OF ANY COVERAGE UNDER THIS POLICY.

DISCLOSURE OF TERRORISM RISK INSURANCE ACT PREMIUM

The portion of your annual premium that is attributable to coverage for acts of terrorism is: $ 76.82

In accordance with the federal Terrorism Risk Insurance Act, the **Insurer** is required to provide the **Insured** with a notice disclosing the portion of the **Insured's** premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of the **Insured's** premium attributable to such coverage is shown in the Policy Declarations.

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage as follows of that portion of the amount of such insured losses that exceeds the applicable insurer retention. The federal share of terrorism losses is 80%.

However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury will not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** have met the **Insurer** deductible under the Terrorism Risk Insurance Act, the **Insurer** will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**All other terms and conditions of this Policy remain unchanged.**

Policy Number:   OBD-CB-S3DTFHJ5Z-002

Issue Date: Aug 15, 2023
Effective Date: Aug 12, 2023

cowbell®

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

Solely for the purpose of coverage under this endorsement it is understood and agreed the following changes are added to the **Policy**:

CERTRIFIED ACTS OF TERRORISM

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met the **Insurer** deductible under the Terrorism Risk Insurance Act, the **Insurer** will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** includes the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for **First Party Loss, First Party Expense**, or **Liability Expense** that is otherwise excluded under this Policy.

**All other terms and conditions of this Policy remain unchanged.**

Policy Number:  OBD-CB-S3DTFHJ5Z-002

Issue Date: Aug 15, 2023
Effective Date: Aug 12, 2023



# TRADE OR ECONOMIC SANCTIONS EXCLUSION ENDORSEMENT

Solely for the purpose of coverage under this endorsement it is understood and agreed the following changes are made to the **Policy**:

This insurance does not provide any coverage, and the **Insurer** shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose the **Insurer** to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited, to those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

**All other terms and conditions of this Policy remain unchanged.**

**Exhibit A to Joint Summary Judgment Stipulations**
**Page 59 of 66**

Policy Number:   OBD-CB-S3DTFHJ5Z-002

Issue Date: Aug 15, 2023
Effective Date: Aug 12, 2023



6800 Koll Center Parkway, Suite 250, Pleasanton CA 94566

# SURPLUS LINES COMPLIANCE NOTICE

ISSUING CARRIER   **Obsidian Specialty Insurance Company**

We are pleased to enclose policy documents for this account.

Please be advised that by binding this risk with the above referenced Surplus Lines Insurance Company, you agree that as the Surplus Lines Broker responsible for the placement of this insurance policy, it is your obligation to comply with all States Surplus Lines Laws including completion of any declarations / affidavits that must be filed as well as payment of any and all Surplus Lines taxes that must be remitted to the State(s). We will look to you for indemnification if controlling Surplus Lines Laws are violated by you as the Surplus Lines broker responsible for the placement.

You further confirm that any applicable state requirement concerning a diligent search for coverage by admitted carriers has been fulfilled in accordance with state law.

Thank you for this placement and your regulatory compliance.

NAMED INSURED:   **Perry & Perry Builders, Inc.**

POLICY NUMBER:   **OBD-CB-S3DTFHJ5Z-002**

STATE:   **TX**

SURPLUS LINES BROKER:   **Christian Mathas**

FILING STATE SURPLUS LICENSE NUMBER:   **1624899**

AGENCY NAME:   **RT Specialty**

AGENCY MAILING ADDRESS:   **180 N. STETSON AVENUE, SUITE 4600 , ,CHICAGO ,IL ,60601**

**Exhibit A to Joint Summary Judgment Stipulations**
**Page 60 of 66**

Policy Number:   OBD-CB-S3DTFHJ5Z-002                    Issue Date: Aug 15, 2023
                                                        Effective Date: Aug 12, 2023



6800 Koll Center Parkway, Suite 250, Pleasanton CA 94566

# TEXAS SURPLUS LINES NOTICE

This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as surplus line coverage under the Texas insurance statutes. The Texas Department of Insurance does not audit the finances or review the solvency of the surplus lines insurer providing this coverage, and the insurer is not a member of the property and casualty insurance guaranty association created under Chapter 462, Insurance Code. Chapter 225, Insurance Code, requires payment of a 4.85% percent tax on gross premium.

Issue Date: Sep 22, 2023
Effective Date: Sep 22, 2023



## POLICY CHANGES ENDORSEMENT

Solely for the purpose of coverage under this endorsement it is understood and agreed the following changes are added to the **Policy**:

| The following item(s): | is (are) deleted and replaced with the following: |
|---|---|
| Filing Policy Number | OBD-CB-S3DTFHJ5Z-002 |
| Item 1. Named Insured | see below |
| Item 2. Policy Period | |
| Item 3. Retroactive Date | |
| Item 4. Aggregate Policy Limit of Liability | |
| Item 5. Insuring Agreement(s) purchased, Limits of Liability, and Retention | |
| Item 7. Extended Reporting Period | |
| Item 9. Endorsements attached: | |
| Item 10. Notice: | |
| for no additional premium | |

Effective September 22, 2023 **Item 1. Named Insured - Mailing**

**Address** reads: 300 Josie Ln., Rockdale, TX 76567

**All other terms and conditions of this Policy remain unchanged.**

Policy Number: OBD-CB-S3DTFHJ5Z-002

Issue Date: Sep 22, 2023
Effective Date: Aug 12, 2023



# ADD/DELETE ENDORSEMENT

For no additional premium, it is understood and agreed that the **Insured** has exercised its right to add the following endorsements to the **Policy**:

FULL SYSTEM FAILURE ENDORSEMENT                                    PRIME 250 008 09 20

**All other terms and conditions of this Policy remain unchanged.**

Issue Date: Sep 22, 2023
Effective Date: Aug 12, 2023



## FULL SYSTEM FAILURE ENDORSEMENT

Solely for the purpose of coverage under this endorsement it is understood and agreed the following changes are made to the **Policy**:

**A.**  SECTION II. DEFINITIONS of the **Policy** is amended by the removal and replacement with the following:

**QQQ. System Failure** means:

(1)  an accidental, unintentional, or negligent act or an error or omission committed by the **Insured** or the **Service Provider**: or

(2)  the physical theft of hardware, or components thereof, controlled by you on which **Electronic Data** is stored, by a person other than an Insured, from a premises occupied and controlled by you.

**B.**  The following limit and deductible applies solely to the coverage provided in this endorsement:

| Coverage | Included (yes/no) | Each **Claim** Limit of Liability | Deductible / Waiting Period | Retroactive Date |
|---|---|---|---|---|
| Full System Failure | Yes | $1,000,000.00 | $5,000.00 | N/A |

**All other terms and conditions of this Policy remain unchanged.**